**STATE of Missouri, Respondent,**

v.

**Andrew Dale SMITH, Appellant.**

**No. WD 40859.**

Missouri Court of Appeals,
Western District.

May 2, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 27, 1989.

Application to Transfer Denied
Aug. 1, 1989.

Robert G. Duncan, Kansas City, for appellant.

William L. Webster, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before KENNEDY, C.J., and LOWENSTEIN and GAITAN, JJ.

GAITAN, Judge.

Defendant-appellant, Andrew Dale Smith, was originally charged in the Livingston County Circuit Court with burglary in the first degree and assault in the first degree. The latter charge was amended to assault in the second degree. A change of venue was granted and the cases were eventually transferred to Clinton County where they were consolidated for trial. He appeals the jury verdicts of guilty and his sentence of five years and one year, consecutively.

Appellant was 41 years old and had been a farmer all of his life. He lived on the farm in a duplex type house with his wife, Karen, his mother and father, Kathryn and Walter, and his two children, Tammy and Rodney. Tammy was 21 years old and Rodney was 17 years old at the time of the occurrences in question. Both children were paid by their parents for work done on the farm $100, then $150 every two weeks. Their other needs were taken care of by their parents.

Douglas Nau was a hog buyer and met defendant and Walter through this business. Doug and his wife Patty were in financial trouble, so appellant and his family befriended them, loaned them money and bought them a pick-up truck. Doug was to pay appellant $200 per month for the truck.

On March 24, 1986, Tammy informed her mother that she and Rodney were leaving home. Over the objections of appellant, the State offered evidence that Tammy told Rodney and her mother that she had been

sexually abused by appellant. Appellant denied this allegation.

On March 24, Tammy and Rodney wrote a check for either $5,000 or $5,700 on their parents' bank account. Part of this money was voluntarily given to the Naus by Tammy.

The children stayed the nights of March 24th and 25th with the Naus. On the 24th Tammy called her parents but did not say where she and Rodney were. The morning of the 25th, appellant brought hogs to Doug to sell but was not told that Tammy and Rodney had spent the night at his house. On the 24th, appellant and Karen met with their children at the Nau residence as a neutral ground and again were not told the children were staying there. On the 26th, Karen and Kathryn learned of the large check the children had written and they told appellant and Walter who were working in the fields. Appellant and Walter went looking for the children. They stopped a Missouri State Highway Patrolman for help but were refused help and were referred to the sheriff. They then went to the sheriff for help, but were refused help because of the age of the children.

Earlier that day appellant and Walter had retrieved the pickup truck from Doug and he had again failed to tell them the children were staying with him. Doug and Patty then went to the sheriff's office and attempted to secure a restraining order against defendant. The sheriff did not tell appellant and Walter of their efforts but advised them not to go to the Nau house.

Appellant and Walter then checked all the motels in Chillicothe and then drove by the Naus. There, appellant observed the Blazer automobile the children had taken parked in the garage of the Nau house. Upon their arrival Doug told Tammy and Rodney to hide in the basement.

Appellant went to the Nau's door, opened the screen door and knocked and/or rang the bell. The Naus testified that Doug refused to let appellant in and that appellant then kicked or butted the door in. However, appellant testified that Doug opened the door but when he said he had

come for Rodney, Doug grabbed appellant and pushed him back into the door. The glass in the door was broken at some point and appellant was cut on his elbow. Appellant and Doug then wrestled. In the meantime, Rodney and Tammy grabbed the arm of Walter, who was holding a knife. Walter turned loose of the knife and Doug picked it up and put it in his pocket. Appellant had yelled at Walter to put the knife down. The evidence was that Walter's knife was a folding Uncle Henry pocket knife. Appellant, Doug and Rodney also had such knives. An identical knife was found in the pickup truck appellant arrived in.

After the wrestling broke up, appellant entered the garage and stabbed the four tires on the Blazer with a knife he removed from his pocket. After this, appellant tried to pull Rodney to his pickup.

At sometime Doug received a cut on his left chest wall. There was no evidence as to how, when or from whom Doug received this wound. Patty testified that appellant entered the door with a knife in an attack position. Doug, Rodney and Tammy, however, never observed appellant with a knife until he entered the garage and took one from his pocket to puncture the Blazer's tires. Appellant denied entering with a knife drawn and denied cutting Doug.

The sheriff, who had been called by Patty, arrived and arrested appellant and Walter. The sheriff was later notified by appellant's attorney that he had left his knife in the sheriff's car. The scene was photographed and items of evidence were gathered and sent to the laboratory. There was no blood found on either knife.

The Naus filed a civil damage suit against appellant and Walter, and Doug Nau filed an affidavit reciting that Walter had stabbed him.

Dr. Sensenich testified that Doug's wound was not consistent with a glass cut, but that appellant's wound was. Dr. Boulware, by deposition, testified that Doug's wound was caused by a very sharp object such as a knife or non-jagged piece of glass. At the end of the State's evidence

and at the end of all evidence, appellant's motions for acquittal were overruled.

During the State's closing argument the prosecutor said, in speaking of the appellant's evidence, "Where's his wife?" Appellant moved for a mistrial and this request was overruled. The State argued to the court that since Karen was not equally available that this was a proper argument. The prosecutor made no further mention of appellant's wife.

## I.

Appellant's first contention is that the trial court erred in failing to grant a mistrial after the prosecutor made a comment regarding appellant's wife. We disagree. Appellant relies on section 546.270, RSMo 1986 and Rule 27.05(a) to support his contention. Section 546.270 reads as follows:

Failure to testify not to prejudice defendant

If the accused shall not avail himself or herself of his or her right to testify, or of the testimony of the wife or husband, on the trial in the case, it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt, *not be referred to by any attorney in the case,* nor be considered by the court or jury before whom the trial takes place. (Emphasis added).

Rule 27.05(a) is virtually identical to the above statute in that both prohibit a direct reference to a defendant's spouse's failure to testify.

▄▄▄ In the case at bar, the prosecutor made his comment during closing arguments.

Mr. Duncan was real good in telling you all the qualms with our evidence. Well, let's talk about his evidence, the defendant. Where's his wife? She's the one that's supposed—

MR. DUNCAN: Just a moment. Let's step up here, your Honor.

(Whereupon the following proceedings were had at the bench, out of the hearing of the jury:)

MR. DUNCAN: I'm going to have to move for a mistrial. He cannot comment on the defendant, on his wife not testifying.

MR. HOLTSCLAW [Prosecutor]: Yes, I can. She's not—she's not accessible to me. She was a defense witness.

MR. DUNCAN: There's a statute, constitutional provision, your honor.

MR. HOLTSCLAW [Prosecutor]: I disagree.

THE COURT: Well, motion overruled. Direct and pointed references to the failure of the wife of a defendant to testify does constitute reversible error. *State v. Therman,* 597 S.W.2d 254, 255 (Mo.App.1980). However, the prosecutor's comment in the case at bar was not a direct and pointed reference in that the thought was never finished or developed. Additionally, the prosecutor abruptly changed his line of argument after the objection. Considerable latitude is tolerated in the closing argument. *State v. Smith,* 726 S.W.2d 418, 422 (Mo.App.1987). In *State v. Stuckey,* 680 S.W.2d 931 (Mo. banc 1984), the Missouri Supreme Court stated that "[a] conviction will be reversed for improper argument only if it is highly likely that the argument had a decisive effect on the jury's determination." *Id.* at 937.

"An error which in a close case might call for reversal may be disregarded as harmless when the evidence of guilt is strong." *State v. Baker,* 741 S.W.2d 63, 66 (Mo.App.1987). When the court is fully satisfied that an error did not contribute to the result reached by the trial court, then the judgment should not be reversed. *Id.* at 67.

In the case at bar, the evidence presented strongly supports the verdict. When viewed in the context of the entire record, it is clear that the prosecutor's brief mention of appellant's wife did not so prejudicially "tip the scales" as to deprive him of a fair trial. *See State v. Frankoviglia,* 514 S.W.2d 536, 539 (Mo.1974). Appellant's wife was not a witness to the burglary and assault with which appellant was charged. Appellant's first point of error is therefore ruled against him.

## II.

Appellant next contends that the trial court erred in admitting evidence that appellant's daughter had been sexually abused in that such evidence was irrelevant and highly prejudicial. We disagree. Evidence of uncharged crimes committed by a defendant is usually inadmissible unless that evidence is logically relevant to establish the defendant's guilt of the crime charged. *State v. Kenley*, 693 S.W.2d 79, 81 (Mo. banc 1985). Examples of such logical relevancy or exceptions to the rule prohibiting evidence of other crimes are when the evidence of the uncharged crimes tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other; and (5) identity of the accused as the individual who committed the crime charged. *Kenley*, 693 S.W.2d at 81; *State v. Sandusky*, 761 S.W.2d 710, 713 (Mo.App. 1988); *State v. Cheek*, 760 S.W.2d 162, 166 (Mo.App.1988).

■ In the case at bar, Tammy's allegations against her father were the catalyst for her decision to move from her parents' home to the Nau residence, and, in turn, motivated the incident at the Nau residence and his violent attack on Douglas Nau. Tammy testified that on March 24, 1986, she and her brother moved to the Nau residence from her parents' home in Meadville because she had been sexually abused, beginning in approximately the seventh grade. She stated that she delayed leaving until her brother turned 17 years old and could legally go with her.

On the day after they moved to the Nau residence, Tammy and her brother had a meeting with her parents in the living room of the Nau home to discuss her reasons for leaving home. A minister and his wife later joined this meeting and spoke with appellant as he was leaving. According to Tammy, appellant denied the sexual abuse. Tammy and her brother remained with the Naus, and the following day, after receiving a threatening telephone call from appellant, the Naus went to the Livingston County sheriff's office to see if they could get a restraining order to keep appellant away from the Nau home and place of business.

Although appellant insisted at trial that he had attempted to force his children to return home because he thought Doug and Patty Nau had kidnapped them and had them drugged because they were draining his bank account, and because he was afraid that the Naus were taking his children to a cult type church, the jury could reasonably have found from Tammy's testimony that appellant's actual motive for seeking her return home was to stop her allegations or, possibly, to resume his incestuous conduct with her.

Since Tammy's testimony concerning appellant's sexual abuse was crucial in establishing the appellant's motive for the offenses, it was admissible. "Wide latitude is generally allowed in the development of evidence of motive." *State v. Mallett*, 732 S.W.2d 527, 535 (Mo. banc 1987). Therefore, appellant's second point fails.

## III.

■ In his third and fourth points on appeal, appellant contends that the verdicts of guilty for burglary in the first degree and assault in the second degree were not supported by sufficient evidence and that appellant's motion for judgment of acquittal should have been granted. We disagree. First, with respect to the burglary charge, appellant argues that the State failed to prove that he entered the Nau residence with the intent of committing an assault. Rather, appellant asserts that the evidence showed that he entered for the purpose of taking his children back home. Section 569.160.1, RSMo 1986, burglary in the first degree, states:

1. A person commits the crime of burglary in the first degree if he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein, and when in effecting entry or while in the building or inhabitable structure or in immediate flight

therefrom, he or another participant in the crime:

(1) Is armed with explosives or a deadly weapon; or

(2) Causes or threatens immediate physical injury to any person who is not a participant in the crime; or

(3) There is present in the structure another person who is not a participant in the crime.

In the case at bar, the State's evidence showed that on the evening of March 26, 1986, when the burglary and assault occurred, appellant and his father came to the residence of Doug and Patty Nau and demanded entry. There was testimony that when Doug did not immediately open the door, appellant stated, "I have a knife in my pocket here and I'll kill you." When the Naus still refused to open the door, appellant kicked it down, breaking the glass in the window and chain lock, and damaging the molding around the door frame. According to Patty Nau, appellant came through the door in an attack position saying, "I'll kill you, I'll kill you son of a bitch." Doug Nau testified that he heard appellant say, "I'll kill you, you son of a bitch, I'll kill all four of yous." There was testimony that appellant came at Doug Nau swinging and that Doug responded by lowering his head and propelling appellant backwards against the door. Appellant grabbed Doug in a headlock, and the two of them fell to the floor leaving Doug's left side exposed. As Doug was attempting to escape appellant's grasp, he saw Walter coming at him with a knife. When Walter reached the spot where appellant and Doug were wrestling, Doug heard appellant say, "Dad, I got him, kill him."

This testimony and evidence, if believed by a jury beyond a reasonable doubt, was sufficient to prove that appellant and his father forced their way into the Nau home with the intent to assault Doug Nau.

■ In regard to the assault charge, appellant contends that the State's evidence did not support the allegation in the indictment that appellant or Walter Smith attempted to kill or cause serious physical harm to Doug Nau by stabbing him. Appellant suggests that insofar as the State's evidence tended to show that appellant's father stabbed Doug Nau, it was merely circumstantial and hypothesizes that the deep cut suffered by Doug might have been caused when he and appellant were wrestling on the broken glass from the Naus' front door. The State's evidence showed that appellant announced his intent to kill Doug, urged his father, Walter Smith, to stab Doug while Doug's left side was exposed, and that Walter, at appellant's urging, moved into position to stab Doug with his knife drawn.

Furthermore, the State's medical evidence showed that the severe laceration suffered by Doug Nau could not have been caused by him rolling on broken glass. Dr. Gregory Sensenich testified that Doug had received a superficial cut on his elbow which was, in fact, consistent with being cut on broken glass. However, Doug's other injury, a very long continuous laceration on his left side, was not consistent with rolling around in broken glass. Dr. Sensenich likened the more serious cut to a surgical wound in contrast to cuts from broken glass, which usually are a more jagged type of a wound.

The State also introduced into evidence the deposition of Dr. William T. Boulware, who testified that he had treated a deep laceration to the left chest wall of Doug which required seven deep stitches to bring the subcutaneous tissue together, and 31 more stitches to close the one-and-one-half-inch wound. Dr. Boulware said the laceration was potentially very dangerous and said he had rarely seen such an extensive wound. Dr. Boulware testified that the laceration was caused by a very sharp object, something that was capable of making a totally clean surgically appearing laceration. Dr. Boulware said that the injury was not a stab wound, which would look like a puncture, but rather was a slashing type of wound. He added that it was not likely that the injury could have been suffered by someone rolling on the floor in broken glass.

Such evidence, if believed by the jury, was sufficient to enable the jury to find

that appellant had been stabbed during the break-in by either appellant or his father, Walter Smith, while he was acting in concert with appellant. Therefore, the trial court properly overruled appellant's motion for judgment of acquittal with respect to both the burglary and assault charges.

The judgment of the trial court is affirmed.

All concur.