Lana L. **ANDERSON**, Appellant,

v.

Bryan **GOEKE**, Superintendent of Renz Correctional Institution, Appellee.

No. 94–1813.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 17, 1994.

Decided Jan. 11, 1995.

Rehearing Denied Feb. 15, 1995.

---

Robert B. Ramsey, St. Louis, MO, argued, for appellant.

Frank A. Jung, Asst. Atty. Gen., Jefferson City, MO, argued (Michael Spillane, on the brief), for appellee. •

Before RICHARD S. ARNOLD, Chief Judge, BRIGHT, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

BRIGHT, Senior Circuit Judge.

## I. INTRODUCTION

Lana Anderson appeals the district court's[1] denial of her petition for a writ of habeas corpus under 28 U.S.C. § 2254. Anderson was convicted of first degree murder and sentenced to life imprisonment for the contract killing of her husband, John Anderson. Anderson raises three issues on appeal: (1) the prosecutor denied her due process by introducing allegedly irrelevant, inflammatory and overly prejudicial evidence of bad character and uncharged crimes and commenting thereon; (2) her trial counsel violated her sixth amendment right to effective assistance of counsel by failing to object to the admission of this alleged inflammatory and irrelevant evidence; and (3) the trial court denied her due process by refusing to allow expert testimony and a jury instruction on whether Anderson's actions constituted self-defense for purposes of the statutorily-defined Battered Spouse Syndrome defense. We affirm the denial of habeas relief.

## II. BACKGROUND

Sometime between 3:00 and 4:00 a.m. on March 14, 1987, John Anderson was brutally murdered at his own home in Pettis County, Missouri. The evidence presented at Lana Anderson's trial indicated that co-defendants James Quick, Joe Corpier and Rick Miller had driven to the Andersons' home that morning and had shot John Anderson four times (once in the chest, and three times in the buttocks) with Anderson's own shotgun. At the time of the murder, Lana Anderson had entered the emergency room of a local hospital for treatment of an alleged illness. She returned at 4:30 a.m. to find her husband dead.

Lana Anderson was charged by information in the Circuit Court of Pettis County, Missouri, with first degree murder, in violation of Mo.Rev.Stat. § 565.020 (Supp.1994). The information alleged that on or about March 14, 1987, Anderson, acting with others, caused the death of her husband, John Anderson, at their residence in Pettis County. Appellant's jury trial began on January 11, 1988 and lasted for five days.

At trial, Anderson did admit to having discussed with various people, including co-defendants James Quick, Elaine Schultz, Joe Corpier and Rick Miller, a plot to kill her husband. Additional evidence strongly suggested that she had offered these individuals compensation from either an expected inheritance or the proceeds from her husband's life insurance policy. The defendant also admitted having been involved sexually with at

---

1. The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

least one of the co-defendants, and to having given another co-defendant her husband's shotgun to commit the murder.

Anderson's trial defense, however, focused on establishing that she was never serious about killing her husband, and, alternatively, that even if she were serious, she had abandoned any such plans prior to March 14, 1987. According to Anderson, because she had attempted to contact several of the co-defendants in the hours immediately preceding the murder, had left the lights on in her house as a signal not to go through with the murder, and had left before the murder took place, she had clearly evidenced a desire not to go through with the plan. During cross-examination, however, Anderson's own testimony suggested that while she may have abandoned the original plan, she had only abandoned the part that most directly involved herself.

Initially, the planners conceived the murder as a robbery and rape gone awry. The culprits planned to slap around and beat Lana to protect her from suspicions that she had collaborated in the murder. However, in a statement given to the police and during her own testimony at trial, Anderson admitted that she feared being beaten, and did not want to participate in this part of the plan. Less than an hour before the murder, the defendant went to the emergency room at the local hospital, complaining of abdominal pains. The treating physician did not find anything medically wrong with her. An hour after the murder, the defendant returned home. Thus, Anderson's defense presented equivocal evidence of abandonment.

Anderson's second defense focused on contentions that her husband had physically and emotionally abused both her and her children, and on several occasions had threatened her life. Anderson offered testimony that she could no longer take the abuse and believed that to end this abuse required the death of her husband. Some witnesses testified that they had seen Anderson with a black eye and had observed her oldest son with rug burns. Additionally, a psychologist testified at trial that the defendant suffered from a form of post-traumatic stress disorder, known as Battered Spouse Syndrome.

According to the psychologist, years of abuse had so grossly impaired Lana Anderson's mental functioning that she could no longer recognize the wrongfulness of her actions.

The State, however, painted a very different picture. Although the State accepted some of Anderson's contentions of physical abuse, they sought to characterize the defendant as a woman motivated by greed and lust. The State presented the testimony of several men with whom the defendant had had extramarital affairs, including James Quick—one of the three men directly implicated in the murder, and Bobby Thompson—with whom she had two of her children. The State also established that Mrs. Anderson stood to gain close to $100,000 in life insurance benefits from her husband's death, and that only weeks before the murder sought to purchase a new vehicle and a new home.

On January 15, 1988, the jury returned a verdict of guilty to the charge of murder in the first degree. On January 16, the jury recommended that Anderson be sentenced to life imprisonment without the possibility of parole. The trial judge sentenced Anderson in accordance with the jury's recommendation.

Anderson thereafter filed an appeal concerning the conviction and sentence to the Missouri Court of Appeals, Western District of Missouri. In addition, Anderson filed an unsuccessful motion seeking post-conviction relief pursuant to Missouri Supreme Court Rule 29.15, which was denied by the Adair County Circuit Court. The Missouri Court of Appeals issued an opinion on the combined appeal from the conviction and denial of post-conviction relief, rejecting all of Anderson's claims. *State v. Anderson,* 785 S.W.2d 596 (Mo.Ct.App.1990). Anderson's request for a rehearing and/or transfer to the Missouri Supreme Court was denied.

Having exhausted all of her state remedies, Anderson then filed a petition for writ of habeas corpus, pursuant to § 2254, with the United States District Court, Western District of Missouri. With the exception of some additional ineffective assistance of counsel claims, the petition restated Anderson's claims made in the state courts.

Relying heavily on the Missouri Appellate Court's decision, the district court denied each of Anderson's claims for relief. *Anderson v. Goeke*, No. 91–0214–CV–W–1 (W.D.Mo. Jan. 25, 1994) (Order of District Court Judge). Anderson brings this appeal.

## III. DISCUSSION

### A. Prosecutorial Misconduct and Violation of Due Process

■ Anderson's first claim on appeal alleges nine instances of prosecutorial misconduct, stemming from references throughout the trial to Anderson's sexual conduct, including (1) sexual affairs with other men while she was still married to the victim; (2) a pair of panties owned by Anderson with a slit in the crotch; (3) her watching pornographic movies with a man with whom Anderson was having a sexual affair; (4) nude photographs of her taken by her husband; and (5) the uncharged statutory rape of a sixteen-year-old boy. Anderson argues that such evidence and references were irrelevant, unduly prejudicial, and therefore improperly admitted, and its admission denied her due process.[2] We reject this constitutional claim.

The claims raised here are exactly the same claims submitted earlier by the petitioner to the Missouri Court of Appeals. *Anderson*, 785 S.W.2d at 596. That court reviewed the trial record and concluded that no prosecutorial misconduct had occurred: While some of the statements "toe[d] the line [of relevancy], the prosecutor did not cross it." *Id.* at 598.

In reviewing the state court's order and the cases cited therein, the federal district court borrowed heavily from what it characterized as the "well-reasoned and well-supported opinion of the Missouri Court of Appeals," and summarized that court's conclusions as follows:

Concerning the admission of evidence of Petitioner's extramarital affairs prior to the death of Petitioner's husband, such evidence would tend to establish motive because if the victim was dead, there would be no restraint on Petitioner's extramarital lovelife. *State v. Kurtz*, 564 S.W.2d 856, 858 (Mo. banc 1978); *State v. Prewitt*, 714 S.W.2d 544, 551 (Mo.Ct.App. 1986). As to Petitioner's panties and her watching pornographic movies, "wide latitude is generally allowed in the development of evidence of motive." *State v. Mallet[t]*, 732 S.W.2d 527, 535 (Mo. banc 1987) [, *cert. denied*, 484 U.S. 933 [108 S.Ct. 309, 98 L.Ed.2d 267] (1987) ]; *State v. Smith*, 772 S.W.2d 760, 764 (Mo.Ct.App.1989). Regarding the repeated questioning about nude photographs taken by her husband, Petitioner herself raised the issue on direct and the trial court is given wide discretion to determine the permissible scope of cross-examination. *State v. McClintic*, 731 S.W.2d 853, 857 (Mo.Ct.App.1987). Finally, as to the statements by the prosecuting attorney about Petitioner's uncharged commission of statutory rape, such is admissible when it tends to establish motive. *Smith*, 772 S.W.2d at 764; *Prewitt*, 714 S.W.2d at 551. Accordingly, Petitioner cannot establish a due process violation.

*Anderson v. Goeke*, No. 91–0214 CV–W–1 at 4–5 (W.D.Mo. Jan. 25, 1994) (Order of District Court Judge).

The question of undue prejudice in the admissibility of evidence addresses itself to the discretion of the trial court. Here, this evidence bore upon the validity of Anderson's diminished mental capacity claim and supported the State's theory that Anderson killed her husband out of greed and lust. Without necessarily approving admissibility as a matter of the trial court's discretion, we cannot say that the prosecutor's presentation of that testimony violated Anderson's due process rights. *See Wood v. Lockhart*, 809

---

**2.** Although Anderson's claim is one of prosecutorial misconduct, both she and the State blend together the prosecutorial misconduct analysis with an analysis of whether the **trial court** erred in admitting evidence derived from this alleged misconduct. This "mixing" of analyses does not, however, pose a problem for this court. The tests are the same for whether the admission of evidence or prosecutorial misconduct denied a habeas petitioner due process. *Logan v. Lockhart*, 994 F.2d 1324, 1330 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 722, 126 L.Ed.2d 686 (1994).

F.2d 457, 459–60 (8th Cir.1987); *cf. Kerr v. Caspari,* 956 F.2d 788, 790 (8th Cir.1992) (Missouri evidentiary rule on the admissibility of prior acts of child sex abuse comported with due process because it required trial courts to properly weigh the probative value and prejudicial effects of such evidence); *Estelle v. McGuire,* 502 U.S. 62, 70, 112 S.Ct. 475, 481, 116 L.Ed.2d 385 (1991) (evidence of battered child syndrome related to intent and its admission did not violate due process).

■ Additionally, even if we accepted appellant's claim that the state evidentiary ruling was in error, we must emphasize that not every trial error amounts to a constitutional deprivation. As this court has consistently recognized, in a § 2254 habeas corpus proceeding, a federal court's review of alleged due process violations stemming from a state court conviction is narrow. *Newlon v. Armontrout,* 885 F.2d 1328, 1336 (8th Cir. 1989), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990); *Hamilton v. Nix,* 809 F.2d 463, 470 & n. 4 (8th Cir.), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987).

■ Accordingly, we will reverse a state court evidentiary ruling only if the "petitioner ... show[s] that the alleged improprieties were 'so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair.' To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial— i.e., that absent the alleged impropriety the verdict probably would have been different." *Hamilton,* 809 F.2d at 470 (citations omit-

ted). *See also Adams v. Leapley,* 31 F.3d 713, 715 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 754, 130 L.Ed.2d 653 (1995); *Snell v. Lockhart,* 14 F.3d 1289, 1299 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 419, 130 L.Ed.2d 334 (1994); *Kerr,* 956 F.2d at 790; *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). Of particular importance is the frequency and pervasiveness of the alleged misconduct in the context of the entire trial, the weight of the evidence supporting guilt, and whether the trial judge gave a cautionary instruction to the jury on how to properly use the testimony elicited. *Hamilton,* 809 F.2d at 470. *Cf. United States v. Jackson,* 41 F.3d 1231, 1233 (8th Cir.1994) (detailing this three-part inquiry for claims of prosecutorial misconduct on direct appeal).

Upon our review of the record, we cannot say that the prosecutor's remarks and the questioned testimony, when viewed in the context of the entire trial, deprived Anderson of a fair trial. References to extraneous, non-adulterous sexual matters were limited. More frequent references to extramarital affairs, as we have observed, supported a motive for Anderson's alleged conduct.[3]

Finally, we observe that the State presented strong evidence of guilt. Anderson admitted contacting several people to kill her husband, weeks and even months before the murder took place. Tr. at 921–22. She admitted offering money from her inheritance, as well as possibly having offered money

---

**3.** Anderson also claims that the prosecutor attempted to "inject a racial slant on her character, further pandering the jury's prejudice." Appellant's Br. at 20. Anderson points to the following direct examination of Mary J. Anderson, John Anderson's mother:

Q. Did you ever see any other men out at the trailer?
A. Yes.
Q. Do you know who those people were?
A. Yes.
Q. Who were they?
A. One of them was James Quick, one of them was Bobby Thompson, one of them was a colored man by the name of Moe something. I don't know what his name was.

Tr. at 376–77. Mary Anderson was presumably referring to Maurice Byrd, a black man who lived in Lana Anderson's rented apartment in Sedalia between July and November, 1986.

Our review of the trial transcript indicates that at no time did the prosecutor suggest that Lana Anderson had been sexually involved with Maurice Byrd. In fact, the prosecutor's direct examination of Mr. Byrd simply focused on whether Lana Anderson had ever asked Mr. Byrd to kill her husband. Tr. at 1164–66. Additionally, the defense had successfully cleared up any confusion that may have existed, by presenting evidence that Byrd lived at Anderson's apartment with a woman who later became Byrd's wife. Tr. at 1168–69.

from her husband's life insurance policy, to anyone who would commit the murder. Tr. at 921, 934. She admitted giving Elaine Schultz her husband's shotgun less than two days before the murder, tr. at 938–40, and acknowledged calling Don Wilson from her husband's insurance company less than six hours after the murder. Tr. at 992–93.

As for Anderson's claim of abandonment, she undermined her own defense by suggesting that the real motivation for leaving her home on the morning of the murder was not some medical condition warranting an emergency room visit during the very hours that the murder took place, but rather the fear of being beaten by one of her co-defendants. Tr. at 723, 989. Additionally, although Anderson attempted to negate the mens rea component of the murder charge—claiming that years of spousal abuse had rendered her "[g]rossly impaired in virtually all areas of functioning," Tr. at 1050–51, the prosecution presented more than enough evidence to support their contention that Lana Anderson was an active and substantial participant in a planned and calculated killing.

We reject Anderson's due process claim resting on admission of unduly prejudicial evidence and the prosecutor's alleged misconduct in presenting these matters to the jury.

**B. Ineffective Assistance of Counsel**

■ For her second point, Anderson claims that her attorney's failure to object to the above evidence and questioning constituted ineffective assistance of counsel. To establish an ineffective assistance claim, Anderson must show that her counsel's performance was deficient and that the deficient performance prejudiced her defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Adams*, 31 F.3d at 714. Anderson has failed to satisfy either of these requirements.

We have recently held that a defense counsel's failure to object to "improper," inflammatory prosecutorial statements falls "outside the range of competent lawyering."

*Seehan v. Iowa*, 37 F.3d 389, 391 (8th Cir. 1994). Conversely, however, the "performance of an attorney is not deficient for failure to object to **admissible** evidence." *Russell v. Jones*, 886 F.2d 149, 152 (8th Cir.1989) (emphasis added). Missouri has determined that questioned evidence to be admissible. Thus, the failure to object does not rise to the level of establishing ineffective assistance of counsel. *See Maynard v. Lockhart*, 981 F.2d 981, 986 (8th Cir.1992).

**C. Battered Spouse Syndrome**

■ As her final point on appeal, Anderson contends that the state trial court denied her due process by refusing to allow expert testimony and a jury instruction on whether Anderson's actions constituted self-defense for purposes of the statutorily defined Battered Spouse Syndrome defense.[4] Prior to trial, Anderson filed a notice that evidence of Battered Spouse Syndrome would be offered. Subsequently, the State filed a Motion in Limine requesting, among other things, that no evidence that Anderson suffered from Battered Spouse Syndrome be admitted until Anderson had satisfied the prima facie elements of self-defense. The trial court initially sustained the State's motion "to the extent it ... [sought] to exclude anyone from mentioning that [Anderson] suffered from Battered Spouse or Battered Woman Syndrome until such time as self-defense is injected into the case." *State v. Anderson*, No. CR187–4F (Cir.Ct.Mo. Dec. 24, 1987) (Memorandum Opinion and Order).

The issue again arose at the jury selection phase upon appellant's request to be allowed to voir dire the jury regarding the issue of Battered Spouse Syndrome. Anderson then made a formal offer of proof, consisting of the testimony of a court-appointed psychologist, Dr. Margaret Harlan. Dr. Harlan testified that Anderson was, in fact, suffering from the Syndrome. After hearing Dr. Harlan's testimony and the arguments presented by both sides as to the testimony's admissibility, the trial court modified its earlier order. The court decided to allow references

---

4. The Battered Spouse Law provides:
   Evidence that the actor was suffering from the battered spouse syndrome shall be admissible upon the issue of whether the actor lawfully acted in self-defense or defense of another. Mo.Rev.Stat. § 563.033(1) (Supp.1994).

to the Battered Spouse Syndrome during voir dire and during any other stage of the trial, but only as evidence of diminished mental capacity (by which to negate the mens rea element), and not as an affirmative defense. Tr. at 203–04.

Because Dr. Harlan was permitted to characterize Lana Anderson as suffering from Battered Spouse Syndrome, Anderson's complaint essentially boils down to a claim that the trial court denied her due process by failing to issue a self-defense instruction to the jury.[5] In response to this claim at the state level, the Missouri Court of Appeals concluded that "the defendant did not make a prima facia [sic] showing from the evidence of the elements of self-defense justifying the use of deadly force. The literal reading of § 563.033 prohibits the battered spouse syndrome where the defendant has not been able to raise the issue of self-defense." *Anderson*, 785 S.W.2d at 600. The court noted that Anderson had been looking for someone to kill her husband for over three months prior to the murder and that this in no way could be classified as traditional self-defense under Missouri law. *Id.*

Anderson asks us, however, to ignore the Missouri court's analysis of Missouri statutory and decisional law, reevaluate the Battered Spouse Syndrome provision and the case law interpreting it, and arrive at a different conclusion. Our review of the Missouri court's decision is limited to whether its interpretation of Missouri law violated Anderson's fundamental right to a fair trial; otherwise we are bound by the state court's interpretation. *Estelle*, 502 U.S. at 67–69, 112 S.Ct. at 480. Concluding, as the district

court did, that Anderson's due process rights were not violated, we also reject this contention.

## IV. CONCLUSION

For the reasons stated above, we affirm the district court's denial of Anderson's habeas petition.

5. Although Dr. Harlan was supposed to limit her testimony on the Battered Spouse Syndrome to its effects on the victim's mental state, she managed to inject, without objection from the prosecution, some discussion of the Syndrome's relevance to self-defense:

> Q. Now, Dr. Harlan, you say that as this cycle continues and gets progressively worse, there is a tragedy on the horizon. Are there certain types of things that have been identified by the research as perhaps predicting a tragedy about to take place?
>
> A. Yes, there are, called actual predictors of lethality.
>
> . . . .

Q. What is it?

. . . .

A. . . . . Predictors of lethality are so called because they seem to foretell that death is going to take place. Death of one partner or the other. Particular incidences. Women tell us that something set them off, something they could not tolerate any more. It is different for most women.

One of the most common predictors of lethality is when the batterer no longer confines his battering to his wife but starts in on the children. And women tell us "I could not stay and watch my children be abused, so something had to happen."

Tr. at 1035–37.