# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-1435

_____

Tomas G. Ervin,

                   Appellant,

     v.

Paul K. Delo, Superintendent, Potosi
Correctional Center; Michael Bowersox,
Superintendent, Potosi Correctional
Center,

                   Appellees.

Appeal from the United States
District Court for the Western
District of Missouri.

_____

Submitted: June 14, 1999
Filed: October 18, 1999

_____

Before BOWMAN, HEANEY, and FAGG, Circuit Judges.

_____

FAGG, Circuit Judge.

Tomas G. Ervin, a Missouri death row inmate, appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition challenging his first-degree murder and robbery convictions. We affirm.

On December 19, 1988, the body of Richard Hodges was discovered in a ditch near Jefferson City, Missouri. Duct tape bound Richard's hands and covered his nose and mouth. An autopsy revealed Richard had been suffocated to death. The same day,

police obtained a warrant to search the Jefferson City home where Richard lived and operated a real estate business with his mother. When officers entered the house, they found the body of Richard's mother, Mildred, wrapped in garbage bags on the living room floor.

In their search for evidence, police found a note pad beneath a remote control in the bedroom across the hall from the Hodgeses' office. On the pad's top sheet, someone had written a license plate number. An officer tore off the top sheet and placed it in a box with other papers. In the garage, police discovered the Hodgeses' Lincoln Continental was missing and there were bloodstains on the floor near the vacant parking spot. The police found no identifiable fingerprints other than those of the victims and an investigating officer.

On the night of January 14, 1989, the Hodgeses' Lincoln was discovered burning in the parking lot of a Paducah, Kentucky motel. A week later, their credit cards were found near a dumpster behind a supermarket in Jefferson City. On January 24, officers made a final sweep through the Hodgeses' home before releasing it to the Hodgeses' estate. Officers found the note pad with the indentation of a license number, made when someone had written on the sheet above, which other officers had already removed. For the first time, police called in the license number and learned it belonged to an automobile registered to local resident Ervin. Although police did not recognize the name, they decided to question Ervin, and developed a list of his associates, which included a man from Florida named Bert Hunter.

At the request of the police, Ervin came to the Jefferson City police station on February 1. During an interview, Ervin told police officers he did not know the Hodgeses. He also said that in the preceding two months, he had not lent his car to anyone or been on the road where the Hodgeses lived. Ervin said he believed he was traveling around the time of the Hodgeses' murders on December 15 and had credit card receipts at home to prove it. He also denied having seen or been with Hunter in

December. The officers asked whether they could see the credit card receipts, and Ervin agreed to show them at his house. After following Ervin to his home, the officers entered and saw stacks of receipts on the kitchen table. Over Ervin's shoulder, an officer saw a Florida license number on one of the gas receipts dated December 21. When police ran the number later, they learned it belonged to Hunter's car.

On February 17, police executed a search warrant at Ervin's home and seized a roll of duct tape, credit card receipts, telephone bills, and a newspaper. The newspaper contained an article about the Hodgeses' murders, with highlighting on text stating the cause of Mildred's death might have been a heart attack. One of the credit card receipts showed Ervin had paid for medical treatment for Hunter in Jefferson City on December 12, 1988. Telephone records showed that on the day before the Hodgeses' car was set on fire in Paducah, Ervin had called Hunter in Florida from Malden, Missouri, a town only one hundred miles from Paducah.

On February 22, police brought Hunter back from Florida on a parole violation. They questioned him the next day about the Hodgeses' murders, and Hunter denied he or Ervin was involved. On March 7, Hunter repeated his denials, but asked about a $10,000 reward offered by the Hodgeses' estate. The police told Hunter the offer had been revoked. About a week later, on March 15, Hunter told officers he would tell them about the murders if they would put two of his friends on probation and leave another friend alone. Hunter confessed that he and Ervin killed the Hodgeses in a plot to get money. After police obtained a video camera, Hunter refused to put his confession on videotape. When he later pleaded guilty to the murders, the plea was videotaped, and Hunter admitted he and another man killed the Hodgeses and gave a detailed account of the murders, but he refused to say who the man was and specifically denied the man was Ervin.

During Ervin's trial, however, Hunter explained how he and Ervin murdered Richard and Mildred. According to Hunter, in late November 1988, he visited Ervin

-3-

in Missouri. The men were broke and discussed criminal schemes to get money. Hunter suggested robbing a bank, but Ervin wanted to kidnap someone rich from their home and force them to withdraw their money from their bank account. They would then suffocate the victims and dispose of their bodies in a trash incinerator. The men decided to pursue Ervin's idea and drove around Jefferson City looking for possible targets, but did not choose one before Hunter returned to Florida. On December 4 and 5, Ervin visited Hunter in Florida, where Ervin bought rubber gloves to use when carrying out their plan. The men then returned together to Missouri, where Hunter stayed with Ervin. Hunter was ill with strep throat and Ervin paid for Hunter's medical treatment on December 12. Despite Hunter's malady, the men resumed their search for a victim. When they spotted a Lincoln Continental in the Hodgeses' driveway on December 15, they believed they had found the wealthy prey they sought. Ervin pulled his car into the drive, which was visible from the Hodgeses' office. Posing as a messenger with an envelope, Hunter went to the door, and Mildred opened it. Hunter forced his way inside with a gun, and Ervin followed him with a sack of tools for their evil plot, including duct tape, rubber gloves, and garbage bags. Mildred panicked and called to Richard for help. He came out of the office and demanded his mother's release. Richard informed the intruders that his elderly mother had a heart problem, and Hunter told Richard to calm her down. Richard took his mother into a bedroom across the hall from the office and, at Hunter's direction, bound her limbs with duct tape.

In the meantime, Richard and Mildred told them all their money was tied up in a trust fund and they had none in the bank. They promised they would not call the police if the men would simply leave the house. Richard also told the men that someone from the newspaper was coming by the house soon to pick up an advertisement for the realty company. Alarmed at this prospect, the men started to move quickly. They left Mildred on the bed and took Richard to the living room, where they bound his hands and feet with duct tape. Hearing a noise in the bedroom, Hunter returned and found Mildred standing in front of a dresser. Hunter retaped her,

-4-

left her on the hallway floor, and returned to the living room, where Ervin was putting duct tape over Richard's mouth and nose. Richard complained he could not breathe, and Ervin responded, "That's the general idea." Frenzied, Richard initially broke free, but the men subdued and rebound him. While Hunter smothered Richard in the living room, Ervin put a trash bag over Mildred's head and suffocated her.

The killers stole Richard's wallet and Mildred's purse and left in Ervin's car. Shortly after midnight, they returned to the scene of the crime. Wearing rubber gloves, they wrapped the victims' bodies in trash bags and sealed the bags with duct tape. They ransacked the house and found some jewelry, furs, Scotch whiskey, and $16 in cash. They then dragged Richard's body into the garage and put it into the back seat of the Hodgeses' Lincoln. Because Hunter was too weak from his illness to help hoist Richard's body into a trash incinerator, the killers dumped Richard's body in a rural ditch instead. They returned to the house for Mildred's body, but decided to leave it there because it emitted fluids and an unpleasant smell when they tried to move it. They left the Lincoln in a crime-ridden area with the keys in the ignition, hoping the car would be stolen. A few days later, they changed their minds and decided to use the Lincoln as a getaway car in future criminal activity. They recovered it and, on the way to Florida, drove through Paducah, where they scouted banks to rob. While there, they learned the Hodgeses' bodies had been found and they abandoned the Lincoln at a Paducah motel. Ervin and Hunter then made several trips between Jefferson City and Florida continuing in their quest for a bank to burgle. In Florida on December 31, Hunter and Ervin met with friends Dennis Woodrum and Anne Tepo, and, in Ervin's presence, Hunter gave Tepo a bag of jewelry that belonged to Mildred as a "late Christmas present." On January 4, 1989, Ervin and Hunter parted ways. Ervin returned to Jefferson City, but soon called Hunter in Florida to express concern about incriminating evidence left in the Lincoln. Later, Ervin called Hunter and, alluding to the car, stated "he had been to a weenie roast."

When asked about his guilty plea and other statements exonerating Ervin, Hunter explained he was trying to protect a friend and to be "a good convict" when he said Ervin was not involved. Hunter also testified the State was not giving him a sentencing deal in exchange for his testimony and the State was pursuing the death penalty in his case. Indeed, Hunter was later sentenced to death. See Hunter v. Bowersox, 172 F.3d 1016, 1018 (8th Cir. 1999) (affirming denial of Hunter's federal habeas petition).

Besides Hunter's testimony that he and Ervin killed the Hodgeses in an effort to get money, other evidence at trial pointed to Ervin and corroborated Hunter's testimony. Officers testified about finding the paper with Ervin's license plate number scrawled on it in the Hodgeses' home, and handwriting experts testified Richard had probably written it. Police also found the marked-up newspaper clipping in Ervin's house with the highlighting on the uncertain cause of Mildred's death. Credit card receipts showed Hunter was in Jefferson City with Ervin where Ervin paid for Hunter's medical treatment on December 12, and Ervin was with Hunter in his car on December 21 when they bought gasoline. The receipts thus established Ervin had falsely denied to police that he was not with Hunter in December 1988, and showed Ervin's consciousness of guilt. Tepo and Woodrum testified Ervin was with Hunter when Hunter gave Tepo the jewelry in Florida two weeks after the murders, and others testified the jewelry belonged to Mildred. An officer testified Ervin's home is near the supermarket where the Hodgeses' credit cards were found. Thus, although there was no direct evidence besides Hunter's testimony that Ervin was the one with Hunter in the Hodgeses' house, the jury could infer Ervin was there from powerful circumstantial evidence.

Ervin did not testify, but the defense suggested Hunter's accomplice was someone other than Ervin. The defense tried to cast suspicion on Patrick Connell, an occasional associate of Hunter and Ervin. Although Connell lived near the spot where Richard's body was found, Ervin had once lived in the same general area. The defense also pointed to the discovery of an unidentified hair in one of the garbage bags put

around the bodies. Connell's hair was not tested, but his hair was referred to in testimony as blond, while the hair found in the bag was dark. The defense also proposed that Hunter changed his story to implicate Ervin because of anger at a supposed betrayal. Witness testimony also provided Ervin with a possible alibi for the night the Lincoln was burned. Nevertheless, the defense offered no reason why Ervin's car would have been at the Hodgeses' home without him or why Ervin lied to police about being with Hunter in December.

After hearing all the evidence, a Missouri jury convicted Ervin of two counts of first-degree murder and one count of first-degree robbery. Acting on the jury's recommendation, the trial court sentenced Ervin to death. Later, the same trial court overruled Ervin's motion for postconviction relief. See Mo. S. Ct. R. 29.15. In a consolidated opinion, the Missouri Supreme Court affirmed Ervin's convictions, sentence, and the denial of his Rule 29.15 motion. See State v. Ervin, 835 S.W.2d 905, 912 (Mo. 1992). The United States Supreme Court denied Ervin's petition for certiorari. See Ervin v. Missouri, 507 U.S. 954 (1993). Ervin then filed a habeas petition in federal district court challenging his state-court convictions. The district court denied relief, but certified four issues for appeal. We turn to them now.

Ervin first contends his right to effective assistance of trial counsel was violated when his attorney failed to play the videotape of Hunter's guilty plea during trial. Although Hunter implicated Ervin in his trial testimony and in one police interview, Hunter had exonerated Ervin during his guilty plea and on other occasions. On the videotape, Hunter repeatedly said Ervin was innocent of the murders. Ervin asserts his attorney should have played the tape to impeach Hunter's trial testimony.

To prevail on his ineffective assistance of counsel claim, Ervin must show his attorney's performance fell below an objective standard of reasonableness and the deficient performance prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). To establish his attorney's performance was objectively

-7-

unreasonable, Ervin "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). To show prejudice, Ervin must establish a reasonable probability that he would have been acquitted absent the allegedly unprofessional error. See id. at 694.

During an evidentiary hearing, defense counsel testified he knew Hunter's testimony was important to the state's case, but he decided not to play the tape because he wanted to avoid a rehash of the killings' grisly details, which might be the last thing the jury would hear. Lead defense counsel had not personally viewed the tape, but he read the transcript and his co-counsel viewed the tape and discussed its contents with him. In Ervin's direct appeal, the Missouri Supreme Court noted the postconviction court had "found that defense counsel could reasonably decide not to reprise the story of the Hodgeses' deaths to the jury as a matter of trial strategy," and concluded the postconviction court's finding was not clearly erroneous. Ervin, 835 S.W.2d at 930.

Even though Ervin's attorney had told the jury he would play the tape of Hunter's guilty plea, he could reasonably change his mind. During the state's case, Hunter had admitted exonerating Ervin during his guilty plea and on other occasions, and defense counsel cross-examined Hunter about his inconsistent statements. Defense counsel also cross-examined police officers about Hunter's statements to them exonerating Ervin. Rather than playing the videotape during the defense case, defense counsel chose to elicit testimony from Hunter's parole officer, who said that in discussing the murders with him, Hunter had expressly denied that Ervin was his accomplice. Although it is a close question, we conclude Ervin has not overcome the presumption that defense counsel used sound trial strategy. See Gillette v. Tansy, 17 F.3d 308, 311 (10th Cir. 1994) (defense counsel's choice of means to impeach a witness was reasonable trial strategy). Also, because the jury knew Hunter had exonerated Ervin several times--before a judge, his parole officer, and police officers--

there is not a reasonable probability Ervin would have been acquitted if defense counsel had played the tape for the jury.

Second, Ervin claims his right to due process was violated when the trial court denied his motion to strike venireman Crane for cause, forcing Ervin to use a peremptory challenge to preclude Crane from being seated on the jury. "Peremptory strikes are created and governed by state law, and the due process clause guarantees only that the state must apply its own rules fairly." Sloan v. Delo, 54 F.3d 1371, 1387 (8th Cir. 1995); see Ross v. Oklahoma, 487 U.S. 81, 89 (1988). At the time of Ervin's trial, Missouri law entitled a criminal defendant to a "full panel of qualified jurors before being required to make peremptory challenges" and held the failure to sustain a meritorious challenge for cause is reversible error. State v. Wacaser, 794 S.W.2d 190, 193 (Mo. 1990); accord State v. Lang, 795 S.W.2d 598, 600 & n.1 (Mo. Ct. App. 1990); see Sloan, 54 F.3d at 1387.

Ervin argues Crane was not a qualified juror under Missouri law because Crane failed to disclose his store had been burglarized when asked whether he was a crime victim. See State v. Moorehead, 875 S.W.2d 915, 917 (Mo. Ct. App. 1994) (prospective jurors must fully, fairly, and truthfully answer all questions on voir dire so the attorneys can assess their qualifications and intelligently exercise challenges; venireperson may be stricken for cause when the venireperson intentionally conceals the truth to a question explored on voir dire). During voir dire, defense counsel asked the venirepersons to raise their hand if they had been the victim of crime. Although other venirepersons raised their hand, Crane did not. A local attorney watched voir dire to help the defense counsel select a jury, but he did not sit at the defense table, take part in voir dire, pose any questions, or communicate with counsel. After voir dire was completed and the court had released the venire panel from the courtroom, the local attorney asked the court to strike venireman Crane for cause, stating Crane had "been burglarized . . . on several occasions. He refused and did not make any response to the

specific question if he was a victim of a crime." Ervin did not request any further examination of Crane, and the court summarily overruled the challenge.

In dealing with this issue, the Missouri Supreme Court apparently confused venireperson Crane with venireperson Watts, and erroneously stated Crane responded affirmatively when asked whether he had been a victim of a crime, saying his car had been stolen a year and a half ago. See 835 S.W.2d at 916-17; Trial Trans. at 180-81 (voir dire of venireperson Watts). The transcript reflects that Crane did remain silent when asked to report victimization. See Trial Trans. at 179-94. Nevertheless, the Missouri Supreme Court noted the burden is on the party proposing the strike to probe into grounds for disqualification on voir dire, and without proof that Crane's store had been burglarized, the trial court was not required to strike Crane for cause. See 835 S.W.2d at 917. Because the Missouri Supreme Court faulted Ervin for failing to make an adequate record that Crane's store had been burglarized, the district court held the issue is procedurally barred in federal habeas. The district court observed Ervin could have asked the trial court to call Crane to chambers to verify counsel's information and to explain his failure to respond to the question at voir dire. Later, during postconviction proceedings or direct appeal, Ervin could have submitted materials showing Crane's store had been burglarized, but Ervin did not do so. Ervin's failure to develop the facts in state court proceedings, or to show cause for the failure and resulting prejudice, precludes federal habeas review. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 8 (1992).

Third, Ervin asserts the admission of certain evidence at trial violated due process. During the prosecution's direct examination of Hunter, defense counsel objected several times to the prosecutor's use of leading questions. When the prosecutor asked Hunter what happened after he and Ervin abandoned the Lincoln, Hunter responded, "[W]e had came back to Jefferson City. But at that point [we] had no getaway car. So at that point we needed a gun . . . [and] Tommy [Ervin] acquired a shotgun from a pickup truck in Jefferson City. And we were still driving up and

looking at banks . . . ." Trial Trans. at 370-71. Ervin's counsel objected that the shotgun was not relevant, and at the bench, the prosecutor responded that leading questions helped avoid Hunter's blurting out that they went to Florida right after they robbed the bank. Defense counsel told the prosecutor to "go back the way you were" in asking leading questions, but did not request an instruction about the shotgun evidence or the evidence that the men were "looking at banks." Later, before cross-examination, defense counsel asked for a mistrial. The trial court denied a mistrial and criticized defense counsel for not asking for a jury instruction earlier.

The Missouri Supreme Court reviewed admission of the evidence for plain error, and found none. See 835 S.W.2d at 918-20. We choose to review for plain error also. See Sweet v. Delo, 125 F.3d 1144, 1152 (8th Cir. 1997), cert. denied, 118 S. Ct. 1197 (1998). Plain error exists when there was an obvious, prejudicial mistake that affected the trial's outcome. See United States v. Olano, 507 U.S. 725, 732-35 (1993). We cannot say admission of the evidence was so prejudicial that it affected the outcome of Ervin's trial. Ervin also challenges the admission of Tepo and Woodrum's later testimony, admitted over defense counsel's objection, that they saw Ervin with the shotgun. We cannot say there is a reasonable probability Ervin would have been acquitted had the evidence been excluded. See Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995) (standard for due process violation).

Ervin last attempts to show cause for his failure to raise certain issues during postconviction proceedings. According to Ervin, he could not assist his postconviction counsel because he had severe clinical depression, and he asserts the district court should have granted him a hearing to establish his depression's severity.

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986); see also Cawley v. DeTella, 71 F.3d 691, 696 (7th

Cir. 1995) (depression not an external impediment). For mental illness to excuse the procedural bar arising from the failure to pursue state postconviction remedies, the petitioner must make a conclusive showing that he or she was incompetent at the time of the postconviction proceedings. See Nachtigall v. Class, 48 F.3d 1076, 1081 (8th Cir. 1995). To be deemed incompetent, the petitioner must have been "'suffering from a mental disease, disorder, or defect that may substantially affect his capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation.'" Id. (quoting Anderson v. White, 32 F.3d 320, 321 (8th Cir. 1994)).

To show a hearing was justified, Ervin attached affidavits from postconviction counsel and a licensed psychologist. Postconviction counsel said Ervin was "still in a state of shock over the conviction and very much in denial . . . it became clear to me that he was severely depressed. He complained to me of having trouble sleeping and I believed his thought processes to be impaired." Ervin's suggestions to the postconviction attorney were "incomprehensible and he could not seem to understand the legal issues." In postconviction counsel's opinion, Ervin "clearly was not able to assist [her] in any rational manner." The psychologist met with Ervin once and could not completely evaluate Ervin because he did not want to participate. Nevertheless, the psychologist could "state emphatically that this was a man with classic symptoms of a major depressive disorder." She found, "He lacked the energy to engage in the legal process. . . . When [she] saw Ervin, he would not have had the capacity to assist counsel."

The district court decided a hearing would not be productive and the alleged depression could not amount to cause excusing Ervin's procedural default. We agree. As the district court observed, Ervin's alleged depression did not hinder his ability to file a pro se postconviction motion. See Malone v. Vasquez, 138 F.3d 711, 719 (8th Cir.) (mental illness that does not hinder ability to file pleadings is not cause for default), cert. denied, 119 S. Ct. 384 (1998). Further, Ervin was represented by

postconviction counsel and there is no evidence Ervin was unable to consult with her. See id.; Stanley v. Lockhart, 941 F.2d 707, 709-10 (8th Cir. 1991) (possibility that pro se adult petitioner might not have been able to participate effectively in his own defense given diagnoses of childhood schizophrenia insufficient to show incompetence at time of procedural default). Because Ervin did not make a sufficient showing of incompetence at the time of his state-court default, we conclude the district court did not abuse its discretion in denying an evidentiary hearing.

Having rejected Ervin's challenges to his convictions, we deny his petition for a writ of habeas corpus.

HEANEY, Circuit Judge, dissenting.

Because I believe Ervin was denied effective assistance of counsel at trial, and because I believe Ervin's Fifth Amendment right to due process may have been violated by the trial court's failure to ensure a panel of twelve qualified jurors, I respectfully dissent.

I.

Hunter's testimony was the key to the state's case against Ervin. On cross-examination, Ervin's counsel attempted to seize upon Hunter's prior inconsistent statements exonerating Ervin, including Hunter's statements in support of his guilty plea. However, according to Ervin's trial attorney, Hunter's testimony had been "devastating" and "somewhat . . . a surprise." (Postconviction Hr'g Tr. at 19, 25.) The defense was called upon to begin its case at 5:06 p.m. on the second day of trial, after the jury sat through a full day of prosecution testimony concerning, among other things, the autopsies performed on the Hodgeses. Voicing no objection to proceeding at that hour, counsel gave an opening statement outlining the evidence he would present, including evidence that Hunter had previously denied Ervin's involvement in the crime.

-13-

Chief among this evidence was a videotape of Hunter's guilty plea in which Hunter repeatedly insists that Ervin was not involved in the murders. Counsel told the jury:

> And most importantly and finally, I hope to be able to play the tape and I hope we can shorten it up as much as possible of Bert Leroy Hunter's plea of guilty in front of Judge Kinder to show what he actually said then on the 21st of July.

(Tr. Vol. II at 659 (emphasis added).)

The videotape was crucial to Ervin's defense, crucial to undermining the credibility of the prosecution's key witness, Hunter. The defense's entire presentation lasted just a few hours. When the court was adjourned at 9:55 p.m., some thirteen and one-half hours after it was called to order that morning, the defense had rested and the state had begun its rebuttal. The jury, however, had not seen the videotape. After emphasizing the importance of the videotape to the jury, counsel (trying his first capital case) had changed his mind. At the state postconviction hearing, counsel explained he had decided–apparently in the middle of presenting Ervin's case–that he did not want the jury to hear "the gruesome tale" of the murders yet again. (Id. at 29.)

At the outset, I view counsel's performance in the context of the breakneck pace of this trial: the first day of trial lasted until 8:36 p.m., the second day from 8:30 a.m. until 9:55 p.m., the jury began its deliberations in the guilt phase of the trial shortly after noon on the third day, and was sent home at 9:45 p.m. that night after imposing the death penalty. I believe it is impossible to conclude that the failure to present the videotape to the jury was the product of a sound strategic choice. Rather, it was an error either of judgment or neglect by counsel who never viewed the videotape himself (Postconviction Hr'g Tr. at 34), and who acquiesced in the court's instruction to proceed with Ervin's defense at a time when I believe most jurors would rightfully have been somnolent. And although it is only hinted at in the record, I am deeply disturbed by the suggestion that the galloping pace of this trial, at which Ervin's life was at stake,

-14-

reflected concern that the trial be concluded before the start of a "big basketball game."[1]  (Postconviction Hr'g Tr. at 58-59.)

I believe the videotape would have inflicted serious damage to Hunter's credibility.  In it, a relaxed and personable Hunter recounts how he and another man caused the deaths of the Hodgeses, and declares repeatedly that Ervin is "the wrong guy."  All the while, Hunter displays the same disarming and disturbing apparent candor reflected in his trial testimony implicating Ervin.  I believe the jury was entitled not only to learn of the fact of Hunter's prior inconsistent statement exonerating Ervin, but also to observe in a videotaped close-up Hunter's demeanor and presence in so doing.

Second, counsel's failure to offer Hunter's videotaped guilty plea left the jury to speculate as to why it was not allowed to view the videotape.  Regardless of the substance of the videotape, I believe counsel could not reasonably have expected the jury to ignore the glaring absence of what Ervin's attorney announced a few hours earlier to be the keystone of his defense.

II.

With respect to the trial court's denial of Ervin's motion to strike venireperson Crane for cause, I believe the majority incorrectly applies Keeney v. Tamayo-Reyes, 504 U.S. 1, 8 (1992), to conclude that Ervin is barred from further developing the factual record in federal court.  Because the trial court summarily rejected Ervin's challenge to Crane and denied him an opportunity to fully and fairly develop the record in state court, I believe Ervin may not be blamed for the inadequacy of the record, and is therefore entitled to an evidentiary hearing in federal court to determine whether

---

[1]See Mizzou Ready to Topple KU, Seattle Times, January 20, 1990 ("The game may prove to be the best of 219 matchups between the longtime arch-rivals.").

Crane should have been stricken from the venire. <u>See</u> <u>Townsend v. Sain</u>, 372 U.S. 293, 313 (1963). If Crane had in fact been a crime victim and Ervin was thus forced to use a peremptory challenge to exclude Crane, Ervin's due process rights were violated. <u>See</u> <u>Sloan v. Delo</u>, 54 F.3d 1371, 1387 (8th Cir. 1993) (stating that due process requires that state follow its own rules with respect to peremptory challenges); <u>State v. Wacaser</u>, 794 S.W.2d 190, 193 (Mo. 1990) (en banc) (holding that under Missouri law, defendants are entitled to "full panel of qualified jurors before being required to make peremptory challenges").

## III.

For the foregoing reasons, I believe Ervin is entitled to habeas relief.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.