#29790-r-JMK
**2023 S.D. 65**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

MANEGABE CHEBEA ALLY,                    Petitioner and Appellee,

    v.

DARIN YOUNG, Warden of the
South Dakota State Penitentiary,          Respondent and Appellant,

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

\* \* \* \*

MARK KADI of
Minnehaha County Office
  of the Public Advocate
Sioux Falls, South Dakota          Attorneys for petitioner
                             and appellee.

MARTY J. JACKLEY
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota          Attorneys for respondent and
                             appellant.

\* \* \* \*

ARGUED
OCTOBER 4, 2022
OPINION FILED **12/06/23**

#29790

KERN, Justice

[¶1.] Manegabe Chebea Ally was convicted by a jury of first-degree manslaughter for the death of a sixteen-month-old child. He received a 45-year penitentiary sentence with 20 years suspended. Ally appealed his conviction, which this Court affirmed. Thereafter, he filed a petition for habeas corpus alleging that his trial counsel was ineffective by overselling the defense's theory of the case during opening statements, failing to play all of the police interview videos for the jury, failing to question an expert witness on redirect or recall that expert for sur-rebuttal, and losing credibility with the jury by failing to properly disclose a video that served as foundation for one of his expert's opinions. After a series of evidentiary hearings, the habeas court granted Ally relief, determining Ally's counsel was ineffective in several respects and that the cumulative effect of these deficiencies prejudiced Ally's defense, thereby depriving him of a fair trial. The habeas court granted the request of Respondent, penitentiary warden Darin Young, for a certificate of probable cause and he appeals.[1] We reverse.

## Factual and Procedural History

[¶2.] The following factual summary is taken from the evidence and testimony produced at trial. Ally immigrated to America from a Tanzanian refugee camp in June 2010, initially arriving in Lancaster City, Pennsylvania, and moving to Baltimore, Maryland. Ally met Katoke, a Sioux Falls resident, through mutual friends, and the two began a long-distance relationship. In October 2012, Ally

---

1. At the time the petition for habeas corpus was filed, Darin Young was the warden of the South Dakota State Penitentiary. However, he is no longer in this position.

-1-

moved to Sioux Falls to live with Katoke and her two children, C.K., age five, and M.K., age sixteen months.

[¶3.]    On the morning of December 24, 2012, Ally and the two children dropped Katoke off at her job at a local packing plant between 5:00–6:00 a.m.  Ally planned to watch the children for the rest of the day, as he commonly did when he was not looking for work himself or dealing with immigration matters.  After dropping Katoke off, Ally later testified that he took the children back home to get more sleep.  Ally said he woke up for the second time around 9:00 a.m. and took the children with him to the Community Health Clinic where he received vaccinations from nurse Debra Goldstine, which were necessary for him to obtain a green card to legally reside in the country.  At trial, Goldstine remembered nothing out of the ordinary about the appointment, recalling that Ally seemed to appropriately care for the children.

[¶4.]    After visiting the clinic, Ally testified that he took the children home and prepared lunch for them.  Once they had finished eating, Ally said he took M.K. into the bathroom and washed him up.  Afterward, he placed M.K. on the couch next to his sister, C.K., to watch cartoons, while he cleaned the kitchen.  Later, C.K. told Ally that M.K. had fallen asleep on the couch, so Ally took M.K. and put him down to rest in the main bed which he shared with Katoke.[2]  Ally testified that after putting M.K. down for a nap, he went back to the couch to watch TV and listen

---

2.    Katoke and Ally both testified that M.K.'s baby bed had been disassembled and put away.  Katoke stated that M.K. had been sleeping with C.K. until they purchased a new bed for him.

to music. At some point, C.K. told Ally that she was going to her room to take a nap.

[¶5.] Because it was Christmas Eve, Katoke's shift ended at 3:00 p.m., rather than 5:00 p.m. Sometime after 2:30 p.m., Ally said that he went to wake up the children so that they could go pick up Katoke. Ally remembered going to C.K.'s room first. According to Ally, while he was in C.K.'s doorway, he heard a cry from the room where M.K. was sleeping. He later testified that he found M.K. laying on the carpeted floor with his head against the footboard.[3] Ally stated that when he picked M.K. up, he noticed that M.K. was breathing but that something was wrong, so he laid him back down on the floor and called 911.

[¶6.] At 2:00 p.m. that same day, Nicole Mackenzie, a neighbor in the apartment complex, was home from work taking a late lunch break. She testified that the apartment's walls are thin, and she did not hear any yelling or crying. At around 2:40 p.m. she left her apartment and noticed Ally pacing back and forth in the hallway while speaking on the phone before returning to his apartment. Recognizing that Ally seemed panic stricken, she went to the apartment and nudged the partially opened door to ask Ally if he needed any help. Ally responded that he did because something was wrong with the baby.

---

3. Photographs of the bed introduced at trial show that references to the footboard refer to the wooden box frame holding the bed. To remain consistent with the record, we will continue to refer to this as the footboard.

[¶7.]     It was at this point that Nicole realized Ally was on the phone speaking with 911 dispatchers.[4] She took the phone and went into the master bedroom where she found M.K. laying "horizontally on the floor on his back," and "[m]aybe a couple of feet from the bed." The 911 operator directed Nicole to check the baby's mouth for vomit and then administer CPR. Nicole tilted the baby's head to the side to check for obstructions and, seeing none, proceeded to administer CPR.

[¶8.]     Between 2:41 and 2:44 p.m., Metro Communications sent out a Code Four emergency medical dispatch for an unresponsive child that had fallen and was not breathing at 401 South Sycamore Avenue. A Code Four dispatch is sent to fire, police, and paramedics. Michael Gramlick, a fire captain with the Sioux Falls Fire Department (SFFD), and his crew were the first to arrive on scene.

[¶9.]     Captain Gramlick testified that his job was to ensure the apartment was safe for those present and gather information that could help his team while they assessed the patient. While checking the premises, Captain Gramlick found M.K. lying on his back at the foot of the bed. In his final report, Captain Gramlick noted that upon arrival he observed no obvious wounds on M.K. or any signs of abuse. At trial, Captain Gramlick described Ally's demeanor during the incident as "odd," observing that Ally lacked the typical "anxiety that follows having a child hurt."

[¶10.]     Firefighter Michael Wilson, also a certified paramedic, testified that he found M.K. fully clothed, lying supine on the floor next to Nicole, who was

---

4.     Ally is originally from Congo and immigrated to the United States from Tanzania. His primary language is Swahili and the language barrier made it difficult for him to communicate with the dispatchers.

attempting to administer aid. His initial assessment showed M.K. was not breathing and had no pulse, so he began administering CPR and regained M.K.'s pulse within a minute and a half. Still, M.K. was not breathing on his own, so Wilson mechanically ventilated the child using a mask and squeeze bag. Wilson testified that his assessment revealed no observable injuries to M.K.'s head, neck, abdomen, arms, or legs.

[¶11.]     Officer McMahon arrived next and waited outside to help direct the paramedics to Ally's apartment. Officer Statema arrived shortly thereafter. Upon entering the apartment, he located Ally and asked to speak with him. Officer Statema acknowledged that there was a language barrier between them but maintained that they were able to communicate. During their conversation, Ally told Officer Statema that M.K. was sleeping on the bed in the main bedroom, while he was cleaning up from their lunch by washing the dishes, when he heard the baby cry once from the bedroom. He said he found M.K. on the floor with blood at the corner of his mouth. Officer Statema noted that Ally seemed "very calm, emotionless" given the situation, and he recalled that the kitchen was very clean and orderly, and did not look like it was in the process of being cleaned.[5]

[¶12.]     Paramedics arrived within seven to eight minutes of being dispatched and began rendering aid to M.K. on arrival. Katie Kruger, the senior medic on the ambulance crew, intubated M.K. because he was not breathing on his own. She testified that she felt a hard ridge on the back of M.K.'s head. After inserting an IV,

---

5.     The State introduced and the circuit court admitted the body camera videos that Officers McMahon and Statema recorded during their presence at the scene.

Kruger moved the child to the ambulance. Once the ambulance left, Ally and C.K. drove to the meat-packing plant to pick up Katoke and take her to the hospital. Katoke testified at trial that Ally had called her during her break, which she usually took at 2:30, and informed her that M.K. "fell down and took a little injury to the lips and forehead." When Ally arrived at the plant to pick her up, he told her that M.K. was injured after falling off the bed while sleeping.

[¶13.]    Sergeant McManus arrived on scene after the ambulance had left. Upon arrival, she spoke with Officer Statema to get a sense of what had happened and walked around the "scene . . . to see if there was anything that [she] would notice to be unusual or out of place or of evidentiary value." Although nothing stood out, the circumstances led her to believe that more than a fall had taken place, so she called the Sioux Falls Police Department's (SDPD) Crimes Against Persons division, which prompted Detective Carda's involvement in the investigation. SFPD Crime Lab manager Brad Johnson was directed to photograph and measure the scene including the height of the bedframe, mattress and dresser.

[¶14.]    M.K. arrived at Avera McKenna Hospital's Emergency Department (Avera) around 3:00 p.m. Dr. Hafzalah, a board certified pediatric critical care physician, was in the E.R. upon M.K.'s arrival. She testified that M.K. was brain dead from the first moment of her examination. His eyes were fixed, dilated, and without reaction, and his "typical brain stem reflexes" were not present. Two EEGs

showed "zero brain activity."[6] And a nuclear scan "showed no [blood] flow to the brain whatsoever." M.K.'s CT scan "revealed a large, depressed fracture on the left side" of his head, a "large hematoma" over the fracture, and severe brain swelling. Secondary to the head injury, Dr. Hafzalah said M.K. was suffering from disseminated intravascular Coagulopathy (DIC), a severe blood clotting disorder associated with cardiac arrest.

[¶15.]        Dr. Hafzalah testified that because M.K. was a child, the medical team used all possible life-saving measures, despite the "very poor" prognosis. Notwithstanding these efforts, M.K. continued to decline. Immediately upon arrival at Avera, doctors gave M.K. an epinephrine and dopamine drip, the medication equivalent of CPR. Yet, his heart continued to falter, stopping "at least around eight times." Each time, the medical team performed chest compressions and "gave him medication to support his heart." Ultimately, his "heart rate stopped completely[.]" Dr. Hafzalah pronounced M.K. dead around 1:00 p.m. on December 25, 2012. Dr. Hafzalah, as a mandatory reporter, contacted law enforcement because in her view, the alleged fall from a bed did not align with the severity of M.K.'s injuries. In Dr. Hafzalah's opinion, M.K.'s death was caused by "significant nonaccidental trauma to the head" that caused brain swelling and "anoxic ischemic injury."

[¶16.]        Detective Carda led the SFPD's investigative efforts into M.K.'s injuries and subsequent death. Around 4:30 p.m. on December 24, he was asked to

---

6.    EEG stands for Electroencephalography, which is a method of recording brain activity through electrical signals that are picked up by small sensors attached to the scalp.

#29790

investigate an unconscious and unresponsive child receiving treatment at Avera. Detective Carda first spoke with Dr. Hafzalah, who told him that she had concerns about the reported cause of M.K.'s injuries.

[¶17.] Detective Carda's investigation included three recorded interviews with Ally.[7] In the first interview, which occurred on December 24, 2012, Ally summarized the day's events. He told Detective Carda that he took Katoke to work early in the morning and planned to watch the children for the rest of the day. Before noon, he took the children to the clinic, where he received shots necessary to obtain his green card. After the clinic, he took the children home and prepared lunch for them. Ally then put M.K. down for a nap in the bed he shared with Katoke because he and Katoke had put M.K.'s baby bed away earlier that day. When it was time to pick Katoke up from work, Ally went to wake up C.K. While doing so, he heard M.K. cry. He went to check on M.K. and found him lying on the floor with his head resting near the footboard. Ally said that he picked M.K. up and noticed blood in the corner of his mouth. At the end of the interview, Detective Carda gave Ally his card in case Ally wanted to contact him to discuss the incident further.

[¶18.] Dr. Kenneth Snell, a forensic pathologist and the Minnehaha County Coroner, performed M.K.'s autopsy at 1:00 p.m. on December 26, 2012, which Detective Carda attended. Dr. Snell's autopsy report listed the cause of death as

---

7. Ally had the benefit of an interpreter during each interview and was Mirandized.

"blunt force injury to the head consistent with an assault."[8] Later that day, and after being notified that Ally had left him a message asking to talk, Detective Carda interviewed Ally a second time. Although, similar to the first interview, Ally maintained that M.K.'s injuries were caused by an "accident," he additionally disclosed that he and M.K. had played together before the child's nap. Detective Carda asked Ally to demonstrate with a doll how he played with M.K. Ally held the doll under its armpits and lifted it repeatedly in the air to about head height. He also did the same motion while only supporting the doll by its legs. Detective Carda next confronted Ally with autopsy photos showing the severity of M.K.'s skull fractures, but Ally denied that he had done anything to hurt the child.

[¶19.] Detective Carda interviewed Ally a third time on December 27. Before the interview, Detective Carda obtained an arrest warrant and had Ally placed in custody. Again, Detective Carda showed Ally photos of M.K.'s injuries, ensuring that Ally was familiar with what was described as the cause of M.K.'s death. During this interview, Ally gave somewhat contradictory explanations as to the cause of some of the injuries. He alternately suggested that the finger marks on M.K.'s arms were caused by him helping the child out of the car or by their play together. Ally ultimately continued to maintain that M.K.'s more serious injuries were caused by a fall out of the bed.

---

8. Dr. Snell is board certified by the American Board of Pathology and licensed in four states. He testified that during his career he had performed approximately 1,500 autopsies, including approximately 150 on children under two.

[¶20.] A Minnehaha County grand jury indicted Ally on January 9, 2013, charging him with one count of first-degree murder, one count of second-degree murder, and four counts of first-degree manslaughter. Ally's jury trial began on February 18, 2014. He was represented throughout the proceedings by Minnehaha County Public Defenders Traci Smith and Kenneth Jacobs.[9]

[¶21.] At trial, the State sought to prove M.K.'s death was caused by blunt force trauma to the head consistent with an assault. The State called Dr. Snell, who testified using a diagram of the skull showing that the head could be divided into five different planes, one on each side, one in front, one in back and one on top. In Dr. Snell's view, M.K.'s injuries were inconsistent with a fall from a bed because a fall would result in only one impact point, possibly two if the head struck an object before striking the floor, whereas here, M.K.'s skull showed at least four identifiable, distinct impact points to four different planes of the head. Dr. Snell testified that M.K.'s autopsy revealed external injuries to the skin, including (1) a bruise and swelling on his left eye and swelling on his upper and lower right eyelid; (2) three abrasions above his right ear, totaling three inches in length; (3) a laceration where the right ear meets the scalp; (4) a three-and-one-fourth-inch

---

9. At the time of Ally's trial, Traci Smith had been with the Minnehaha County Public Defender's Office for fifteen years, serving two years as an assistant public defender, two or three years as chief deputy, and the rest as director. Kenneth Jacobs had five years' experience as an assistant public defender. In addition to his experience, he completed the National Association of Criminal Defense Attorneys' weeklong trial school in 2011 and a 2014 seminar focused on defending individuals charged with sex crimes and crimes against children. Jacobs was not lead counsel but served as co-counsel with Smith at trial.

contusion wrapping across the back of his head but above ear level; and (5) an abrasion above the left ear and bruising on the bone behind the left ear.

[¶22.] After describing the visible injuries to M.K.'s head, Dr. Snell testified about his process of reflecting the scalp back to analyze the subgaleal space.[10] During this portion of the autopsy, he noted the presence of subgaleal hemorrhaging[11] throughout the scalp, which, as he explained, meant that each hemorrhage was distinct from the other and correlated with the external bruising and swelling he previously discussed. Dr. Snell explained that "[d]ue to the tightly adherent nature of the galea, or the scalp to the skull, [the hemorrhaging] would not be allowed to spread and defuse out in that area." Dr. Snell testified that each separate subgaleal hemorrhage on a different plane of the head represented a separate impact site.

[¶23.] Underneath one subgaleal hemorrhage, Dr. Snell found what he defined as a "large, depressed skull fracture" spanning multiple bones. Dr. Snell testified that a depressed skull fracture is significant because the depression is caused by an object striking the skull with enough force to push it inward. He also specified that the literature supported two mechanisms capable of causing depressed fractures. The first mechanism arises from an impact with an object that has a rounded end, such as a fist or a bat. The second mechanism involves striking

---

10. The term galea refers to the scalp, while subgaleal means under the scalp.

11. Dr. Snell explained that a hemorrhage is bleeding outside a blood vessel. Bleeding contained in the skin, like a bruise, is called a contusion. When the bleeding "occurs into a space or creates a space, that is a hemorrhage or hematoma."

something that has an edge. Dr. Snell explained that falling onto a flat floor would result in a linear skull fracture, not a depressed fracture like the one M.K. sustained. Because M.K. suffered at least four distinct impacts, one of which resulted in a depressed skull fracture, Dr. Snell opined that M.K.'s injuries were inconsistent with an accidental fall and were likely inflicted. He determined the cause of death to be "blunt force injury to the head consistent with an assault."

[¶24.] Ally's defense theory remained consistent with the explanation Ally gave from the beginning: M.K. must have fallen out of bed and struck his head. Ally testified at trial that, after hearing M.K. cry, he found him lying on the floor with the back of his head tilted a little bit up against the footboard. He reiterated that he did not strike or harm M.K. Ally presented testimony from two expert witnesses, Dr. Janice Ophoven, a forensic pediatric pathologist with more than forty years of experience, and engineer Dr. Michael Van Ee, to support his contention that an accidental fall from a short height can result in death.

[¶25.] Dr. Ophoven's[12] testimony conflicted with Dr. Snell's opinion that the subgaleal hemorrhages were all caused by, and evidence of, different impacts. Dr. Ophoven opined that M.K.'s subgaleal hemorrhages were caused by DIC, a clotting disorder, the medical team's life support measures, and the accumulation and settling of fluid. In Dr. Ophoven's opinion, there was one impact and "no evidence of separate impacts of any kind." Additionally, Dr. Ophoven testified that, contrary to Dr. Snell's testimony, the subgaleal space is not tight and that gravity, along

---

12. After being retained by the defense, Dr. Ophoven recommended obtaining a biomechanical engineer to determine whether the fall involved in this case could result in a potentially fatal injury.

with the body's natural circulatory system, was enough to disperse the blood around M.K.'s scalp. Dr. Ophoven pointed to the swelling and bruising on M.K.'s eyes as an example of swelling and bleeding caused by fluid buildup rather than an impact. To exemplify this testimony, she referenced the picture of M.K.'s face at the hospital versus the autopsy photo where his face was "completely swollen" with "engorgement of the eyes from settling of fluid and probably blood in that area." In Dr. Ophoven's opinion, the manner of death should have been classified as undetermined because the cause of death, complications resulting from blunt force trauma to the head, and the injury were consistent with an accidental fall. She also testified that the medical evidence of M.K.'s injuries did not constitute per se evidence of abuse or violence.

[¶26.] The defense also called, Dr. Van Ee, a biomechanical engineer, consultant, and adjunct professor at Wayne State, to render an opinion whether M.K.'s injuries were consistent with the energy and force associated with a fall from a bed. During his testimony, Dr. Van Ee presented information from medical literature, and other sources, including infant cadaver studies and clinical case studies involving falls from playground equipment showing that short falls can be deadly. He also testified that a single impact to the floor could result in more than one fracture and could occur in areas of the head other than the impact site. Dr. Van Ee relied on Dr. Ophoven's conclusion that there was just one point of impact to M.K.'s head when considering whether M.K.'s injuries could have resulted from a fall off the bed. In M.K.'s case, he explained that the worst-case hypothetical,

entailing M.K. falling from a standing position and hitting the footboard as he fell, could generate as much as 500 pounds of force or 100 g's to M.K.'s head.[13]

[¶27.]     Dr. Van Ee premised his testimony on several assumptions. First, based on how Ally described finding M.K., his analysis assumed that M.K. was lying on the floor with his head "actually propped up a little bit against the footboard," after the fall. Second, he formulated his opinion using the worst-case scenario with M.K. standing at the highest spot—the top of the bed mattress—because an accidental fall could be ruled out as a cause of M.K.'s injuries if the worst-case scenario could not produce injuries like M.K.'s. Based on these two assumptions, Dr. Van Ee concluded that the "current scientific data does not allow us to rule out that there was . . . [a] fall scenario" that caused M.K.'s injuries. Dr. Van Ee testified that based on his studies of the research, "short falls can kill. They can be fatal." And he testified that they "can result in bleeding in the eyes." On cross-examination, however, he acknowledged that, while short falls can result in death, they rarely do so.

[¶28.]     After the defense rested, the State re-called Dr. Snell as a rebuttal witness, and he agreed with Dr. Ophoven's opinion that gravity might cause a subgaleal hemorrhage to spread if the person suffers from DIC. Even so, Dr. Snell asserted that Dr. Ophoven's opinion regarding blood flow would, in this case, defy the laws of gravity because the hemorrhaging that resulted from a single impact would have pooled at the back of the head, not to the side and front. He testified

_____

13.     A "g" is a symbol representing "Gravitational force equivalent" or, in other words "g-force."

that during his examination, there was a large amount of pooled blood in the back of M.K.'s head but very little on the sides and front. Dr. Snell further explained that the swelling to the eyes could not have resulted from gravity expanding the subgaleal hemorrhage because "it would seep into both eyes equally, not just one eye." The defense did not recall Dr. Ophoven in sur-rebuttal.

[¶29.] The jury returned a verdict convicting Ally on all four counts of first-degree manslaughter but acquitting him on the first-degree and second-degree murder counts. The circuit court sentenced Ally only on count 3, manslaughter in violation of SDCL 22-16-15(1), for effecting death, without design, during the commission of a felony—abuse or cruelty to a minor. The circuit court imposed a 45-year penitentiary sentence with 20 years suspended. Ally filed a direct appeal from his conviction to this Court which was summarily affirmed on January 19, 2016.

[¶30.] Thereafter, Ally filed a pro-se application for habeas corpus on March 31, 2016. Ally was appointed counsel and filed an amended petition on September 17, 2018, alleging that he received ineffective assistance of counsel at his criminal trial. The State filed a return to the amended petition. The habeas court held a total of eight hearings, four of which were evidentiary proceedings. At three of the hearings, the habeas court heard testimony from Ally's trial counsel, Traci Smith and Kenneth Jacobs. Dr. Ophoven was called to testify at the fourth evidentiary hearing.

[¶31.] Additionally, the habeas court notified counsel by email that it wished to consider *sua sponte* an issue regarding trial counsel's decision to exclude video

footage of Ally's interviews with Detective Carda. The habeas court ordered the parties to brief the issue and held oral argument on this question on November 20, 2020, after which it took the matter under advisement. In July 2021, the habeas court issued a memorandum decision and findings of fact and conclusions of law holding that Ally's trial counsel was ineffective in four respects:

1. The defense's opening statements oversold their theory of the case.

2. The defense failed to play the videos of Detective Carda's interviews with Ally in their entirety.

3. The defense failed to call Dr. Ophoven in surrebuttal to neutralize Dr. Snell's rebuttal testimony.

4. The defense failed to disclose a video they shared with Dr. Van Ee, which he used to formulate his opinions, before trial.

The habeas court granted then-Warden Young's request for a certificate of probable cause to appeal the court's decision. On appeal, the Warden raised one issue which we restate as follows: Whether the habeas court erroneously determined that Ally received ineffective assistance of counsel at trial.

**Standard of Review**

[¶32.]     "We review a circuit court's determination of a Sixth Amendment ineffective assistance of counsel claim as a mixed question, reviewing the court's decision on the constitutional issue de novo and its findings of fact for clear error." *Reay v. Young*, 2019 S.D. 63, ¶ 13, 936 N.W.2d 117, 120. "Claims of ineffective assistance of counsel must be evaluated in light of the totality of circumstances." *Dillon v. Weber*, 2007 S.D. 81, ¶ 11, 737 N.W.2d 420, 425. It is the petitioner's

burden to prove by a preponderance of evidence that he is entitled to habeas relief.

*McDonough v. Weber*, 2015 S.D. 1, ¶ 15, 859 N.W.2d 26, 34.

### Analysis and Decision

> **I.**     ***Whether the habeas court erroneously determined that Ally received ineffective assistance of counsel at trial.***

[¶33.]     "[A] petition for habeas corpus is a collateral attack on a final judgment." *Madetzke v. Dooley*, 2018 S.D. 38, ¶ 9, 912 N.W.2d 350, 353 (citation omitted).  As such, the scope of cognizable issues a petitioner may raise are limited to "such radical defects as to render the proceedings or judgment absolutely void." *Id.* (citation omitted).  The deprivation of one's Sixth Amendment right to counsel through ineffective assistance is enough to render a conviction and sentence void. *Id.* ¶ 10, 912 N.W.2d at 354 (citing *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063–64, 80 L. Ed. 2d 674 (1984)).  Whether a defendant has received ineffective assistance of counsel is analyzed under *Strickland's* familiar two-prong standard:

> First the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction. . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Reay*, 2019 S.D. 63, ¶ 13, 936 N.W.2d at 120 (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).

[¶34.]      To establish that trial counsel's performance was deficient, "the petitioner 'must show that counsel's representation fell below an objective standard of reasonableness.'" *McDonough*, 2015 S.D. 1, ¶ 22, 859 N.W.2d at 37 (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064). "This standard 'remains simply reasonableness under prevailing professional norms.'" *Id.* (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065). To fairly assess counsel's performance, every effort shall "be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" of trial. *Reay*, 2019 S.D. 63, ¶ 14, 936 N.W.2d at 121 (citation omitted). This Court's function is not to "second guess the decisions of experienced trial attorneys [on] matters of trial tactics unless the record shows that counsel failed to investigate and consider possible defenses[.]" *Id.* (quoting *Randall v. Weber*, 2002 S.D. 149, ¶ 7, 655 N.W.2d 92, 96). The petitioner must overcome a "'strong presumption' that counsel was competent." *Piper v. Young*, 2019 S.D. 65, ¶ 50, 936 N.W.2d 793, 810 (quoting *Jenner v. Dooley*, 1999 S.D. 20, ¶ 16, 590 N.W.2d 463, 470).

[¶35.]      Even if trial counsel's performance was deficient, the petitioner must also show that counsel's deficient performance prejudiced the defense. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *McDonough*, 2015 S.D. 1, ¶ 23, 859 N.W.2d at 37 (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066). "[A]ny deficiencies in counsel's performance must be

prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067.

[¶36.]        We have held that deficient performance results in prejudice when the petitioner shows that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694; *see also Reay*, 2019 S.D. 63, ¶ 15, 936 N.W.2d at 121. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. It is not enough to show that counsel's deficient performance "had some conceivable effect on the outcome of the proceeding. Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, 562 U.S. 86, 104, 131 S. Ct. 770, 787–88, 178 L. Ed. 624 (2011) (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064) (internal citation omitted). It is through this *Strickland* standard that we review the habeas court's determination that Ally's defense counsel was ineffective.

### a.    Whether overstating an expert witness's conclusions during opening statements constitutes ineffective assistance of counsel.

[¶37.]        At trial, Jacobs gave the opening statement for the defense. During this statement, he told the jury that, after reviewing all the necessary medical records, the experts "came to the conclusion that this was an accident just as [Ally] explained it was." However, as the case proceeded, the experts testified only that M.K.'s injuries were *consistent* with an accident rather than affirmatively concluding that an *accident occurred*. At the habeas hearings, Jacobs, when asked, agreed that the statement was an oversight rather than part of a trial strategy and

that "[l]ooking back, [he] would have done [his opening statement] differently." Smith testified that, while Jacobs's statement may have "oversold [the defense's theory"], she did not consider it to be a misstatement of what they believed the evidence would show, namely that M.K.'s injuries were from an accidental fall. Nor did she believe the jury would hold Jacobs's remark against them since his opening aligned with their theory of the case. Ultimately, the habeas court determined that counsel "incompetently prejudiced [Ally's] case by overselling the defense to the jury." We disagree.

[¶38.] In determining that Jacobs's opening statement constituted ineffective assistance of counsel, the habeas court failed to enter findings of fact or conclusions of law articulating why counsel's error was unreasonable under prevailing professional norms, as this Court requires under *Strickland*. Instead, the habeas court made a conclusory finding that the statement prejudiced the defense and undermined confidence in the result by "spoil[ing] the proper presentation of the case." This, however, is not our standard. The proper standard is whether trial counsel's performance was *deficient*, and whether that *deficient performance* prejudiced the defense, undermining the result to such a degree that it is no longer reliable. *Reay*, 2019 S.D. 63, ¶ 13, 936 N.W.2d at 120.

[¶39.] The failure to present evidence promised during opening statements can constitute ineffective assistance of counsel in certain circumstances. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003). However, failing to present promised evidence is "not always an error of constitutional dimension." *See Id.* at 671–72 (finding that defense counsel was not ineffective when he decided not

to call certain witnesses that he promised the jury would testify).  Because ineffective assistance of counsel claims are highly fact specific, an attorney's failure to deliver evidence promised during opening statements must be analyzed in consideration with the specific circumstances of each case.  Counsel's failure to present promised witnesses or evidence must be serious enough to overcome the presumption that counsel was acting competently.

[¶40.]        We begin by looking at the nature of Jacobs's promise.  Before the parties gave their opening statements, the jury was instructed that "[a]n opening statement is an outline of what the attorney *thinks* the facts to be without argument."  When viewed in context with its surrounding statements, Jacobs's "promise" merely states what he thought the evidence to be rather than promising what the experts would testify to:

> You'll also hear that since this arrest on December 27th, other doctors, without law enforcement watching over them, have reviewed everything that you'll hear about in this trial; the autopsy report, the 911 call, the interviews, the hospital records. In fact, those doctors reviewed something more than Dr. Snell. They looked at past medical records of M.K. and those doctors came to the conclusion this was an accident just as Manegabe explained it was.  It cannot be said that these injuries represent an inconsistent outcome.  At most, all that can be said is that this is an unexpected accident or infrequent outcome and because of that, myself and co-counsel are going to stand up here when everything is said and done and based on that evidence ask that you find Manegabe Ally not guilty.

[¶41.]        When reviewing this statement in context, it is evident that Jacobs is not specifically detailing the exact testimony anticipated by each of his expert witnesses.  Rather, he is summarizing what he believes they may conclude. Although not fully accurate or as precise as it otherwise could have been, Jacobs's

statement, at worst, represents an impermissible argument for how the jury should interpret the evidence.

[¶42.] Furthermore, the nature of Jacobs's statement is distinguishable from instances where courts have concluded, in much more egregious cases, that the failure to live up to promises made during opening statements constituted ineffective assistance of counsel. In *Ouber v. Guarino*, the U.S. Court of Appeals for the First Circuit agreed that trial counsel was ineffective by failing to present the same defense he had promised to the jury. 293 F.3d 19, 35 (1st Cir. 2002). The defendant was in his third trial after the jury deadlocked on two prior occasions. *Id.* at 22. The defendant testified at each of the two previous trials, and the same attorney represented the defendant each time. *Id.* at 21–22.

[¶43.] At the third trial, during his opening statement, Ouber's defense counsel promised the jury on four separate occasions that the defendant would testify. *Id.* And he emphasized the importance of the defendant's testimony—stating that the case revolved around the defendant's knowledge. *Id.* The defense ultimately rested without calling the defendant as a witness or eliciting her knowledge in some other way. *Id.* at 23. During closing arguments, defense counsel apologized to the jury for not presenting "more of a case" to them as he had promised. *Id.* This time, the jury found the defendant guilty. *Id.* In rendering its decision in *Ouber*, the First Circuit Court reasoned that counsel's failure to call the defendant as a witness was a serious error in professional judgment because it hurt the defense's credibility and prevented the jury from hearing evidence that directly contradicted one of the prosecution's key witnesses. *Id.* at 34–36.

[¶44.]     While the anticipated evidence discussed in Jacobs's opening statement at Ally's jury trial was undoubtably significant, it was elicited from other witnesses throughout the trial.  Here, the defense's entire case rested on the theory that M.K. had received his fatal injuries through an accidental fall off a bed.  Without evidence showing an accident was possible, there would be no defense.  Accordingly, the defense presented testimony from Ally regarding how he found M.K. lying with his head up next to the footboard, and also from two highly qualified expert witnesses who testified that death from a short fall was possible, M.K.'s injuries were consistent with an accident, and the medical evidence could not definitively prove that M.K. sustained multiple impacts.  Because Jacobs's opening statement was based on this same evidence and reflected what he thought the testimony would show, we conclude that his opening statement did not promise significant evidence that the defense ultimately failed to present.

[¶45.]     Aside from Jacobs's imprecise opening remark, there was no further mention of the defense's experts definitively concluding that M.K.'s death was an accident.  This fact also distinguishes this case from *Ouber*, where, during closing arguments, the defendant's attorney told the jury that he had broken a promise he had made to them right before the case was placed in their hands.  293 F.3d at 23.

[¶46.]     Moreover, Smith's closing argument effectively bolstered Jacobs's opening statement with the evidence presented.  Smith argued to the jury that:

> At most, all that can be said is that this was an unexpected or
> an infrequent outcome.  All of us are thankful that this tragic
> accident that led to M.K.'s untimely death [is] rare and
> infrequent. . . Dr. Ophoven testified that had she had the
> responsibility of determining the manner of death here, she
> would have determined that the cause of death was

undetermined. Based on her analysis of all the information in this case, the possibility of all of the information in this case, the possibility of an accident could not be ruled out.

[¶47.] Although defense counsel's statement was admittedly imprecise, in light of the entire trial record, we do not conclude it that it rose to the level of constitutionally deficient performance. Accordingly, we need not address *Strickland's* prejudice prong.

### b. Whether defense counsel's decision to limit the use of video footage from Detective Carda's interviews of Ally constitutes ineffective assistance of counsel.

[¶48.] Detective Carda interviewed Ally three times and all three interviews were videotaped. Before trial, Ally's defense counsel moved to exclude the videos and all references to Detective Carda's interviews with Ally. The circuit court denied the motion. Ally's counsel next filed a motion in limine to exclude certain parts of the videos, including Detective Carda discussing medical opinions of the doctors who Detective Carda claimed did not believe Ally's story and references to Ally's life as a refugee, leaving a wife and children behind in Congo, the proper "tenets of the Muslim religion about living with an unmarried woman," telling lies, and being a killer for failing to keep looking for the children he left behind. The court granted the motion in part, ordering the redaction of certain statements made by Detective Carda, but denied the rest. At trial, the State played for the jury an hour-and-six-minute segment of Detective Carda's December 26 interview with Ally. Although redacted, the redaction removed only the portion of the recording where Ally was sitting alone in the interview room waiting for Detective Carda.

[¶49.] Neither Ally's original nor first amended application for a writ of habeas corpus made the argument that the decision to seek exclusion or redaction of the videos was grounds for ineffective assistance of counsel. The issue was first raised by the habeas court *sua sponte* when it notified the parties of its concern that failure to play the entirety of all three interviews for the jury constituted ineffective assistance of counsel.[14] Ally subsequently filed a second amended petition adding

---

14. At numerous points throughout the habeas proceedings, the court interjected itself raising potential issues for the petitioner. "I typically just feel like I should make sure that I've looked at every piece of paper that's in the file, or digitized media of documentation. And I, um, saved for last, but not least, the review of those interrogation videos from when Mr. Ally was in custody pretrial. And, um, that caused me to think that there may be another issue that had perhaps gone under the radar. . . So, I asked the attorneys to take a look at that and see if they felt that might raise another issue that needed some consideration in the case."

On another occasion, when discussing whether Dr. Snell's opinion at trial had been given to a degree of reasonable medical probability the circuit court inquired, "So, [counsel], let's do another thought experiment here because I really think you're offtrack; but I understand that you have to try to come up with something." The court then discussed with counsel whether Dr. Snell's opinion at trial had been given to a degree of "reasonable medical probability."

The habeas court's conduct here was improper. "It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence." *Harrington*, 562 U.S. at 105, 131 S. Ct. at 788 (internal quotation mark omitted) (citation omitted). Recognizing this, the Supreme Court has warned that the "*Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Id.*

Except in rare instances, the court is a neutral party that adjudicates only those issues raised by the parties. By raising issues *sua sponte* and participating as a pseudo-advocate at the evidentiary hearings, the circuit court abandoned its post of neutrality, threatening the integrity of the very process it was tasked with protecting. We take this opportunity to reiterate the necessity of applying *Strickland's* standard neutrally and with "scrupulous care." *See id.*

these grounds. After this new ground for ineffective assistance was added at the circuit court's suggestion, neither trial attorney was recalled to testify regarding their strategic reasons for not wanting the videos admitted in their entirety. The court simply set the matter for hearing on November 30, 2020, where it invited each party to address the court's concerns before taking the case under advisement. In its final ruling, the habeas court made no findings regarding trial counsel's strategic reasons for not wanting the videos shown to the jury in their entirety. Instead, the court focused only on its own view that failing to play all three recordings in their entirety kept the jury from viewing exculpatory evidence:

> It is the view of this Court that an ordinary juror with common experience would be, as this Court was, deeply affected by the demeanor of [Ally] as he maintained a consistent narrative of his innocence while being subjected to various psychological interrogation techniques conducted with the specific purpose of tripping him up or causing him to succumb.

[¶50.] This Court has emphasized the "well-established rule" that courts shall not raise an issue not first raised by the parties, except in the exceptional case in which a constitutional violation is *apparent*. *See Ibrahim v. Dep't of Pub. Safety*, 2021 S.D. 17, ¶ 22, 956 N.W.2d 799, 804–05 (applying this principle in the context of courts reviewing the constitutionality of statutes *sua sponte*) (emphasis added). We rely on the "parties to frame the issues for decision and assign the courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. ---, 140 S. Ct. 1575, 1579, 206 L. Ed. 2d 866 (2020) (citation omitted). Based on our review of the record from the underlying trial and the habeas hearings, we conclude that this is not the exceptional case requiring the court's *sua sponte* intervention. Even if Ally's habeas counsel had raised the issue,

Ally has failed to show that counsel's actions were unreasonable under prevailing professional norms.

[¶51.] We will accord an attorney's strategic decisions strong deference. "[E]ven if there is reason to think that counsel's conduct 'was far from exemplary,' a court cannot grant relief if 'the record does not reveal' that counsel took an approach that no competent lawyer would have chosen." *Dunn v. Reeves*, 594 U.S. ---, 141 S. Ct. 2405, 2410, 210 L. Ed. 2d 812 (2021) (quoting *Burt v. Titlow*, 571 U.S. 12, 23–24, 134 S. Ct. 10, 18, 187 L. Ed. 2d 348 (2013)) (per curiam). After all, "a difference in trial tactics does not amount to ineffective assistance of counsel." *Piper*, 2019 S.D. 65, ¶ 67, 936 N.W.2d at 814.

[¶52.] The tactical decision to elicit evidence through live testimony rather than a video does not render counsel ineffective. For example, in *Ervin v. Delo*, the Eighth Circuit found that defense counsel's strategic decision to elicit testimony at trial rather than using an exculpatory video did not constitute ineffective assistance of counsel. *See* 194 F.3d 908 (8th Cir. 1999). In this case, Ervin and his co-defendant were alleged to have killed two individuals. *Id.* at 911. Ervin's co-defendant pleaded guilty and filmed a video confession where he claimed another man participated in the killings, but he refused to name the second person. *Id.* At trial, the co-defendant named Ervin as the second man. *Id.* at 911–12. Rather than impeaching Ervin through the taped confession, which would involve "a rehash of the killings' grisly details," defense counsel chose to cross-examine the co-defendant and police about the inconsistent statements. *Id.* at 913. In evaluating the merits

of this strategy, the Eighth Circuit concluded that Ervin was not able to "overcome the presumption that defense counsel used a sound trial strategy." *Id.* at 914.

[¶53.] From their testimony provided on the initially raised ineffective assistance claims, it is apparent that Smith and Jacobs recognized that Ally's video interviews contained exculpatory evidence. However, they made the strategic decision to elicit the same evidence through Ally's trial testimony instead of exposing the jury to potentially prejudicial and inculpatory aspects of the three videos. Smith testified at the habeas hearing that allowing the videos to be shown in their entirety would provide the State with the opportunity to exploit any inconsistencies in Ally's story and potentially undercut his testimony.[15] Rather, in Smith's view, the better course was to allow the jury to hear directly from the defendant when he took the stand. Accordingly, defense counsel made the strategic decision to elicit the same exculpatory evidence through trial testimony rather than playing all three videos for the jury, which totaled six hours in length.[16]

---

15. Based on our review of the record, Ally contradicted himself on several occasions throughout the interviews. For example, in the first interview, Ally talked about moving a sleeping M.K. from the couch directly to the bed. However, in the second interview, Ally talked about playing with M.K. on the bedroom floor before putting him on the bed for a nap. Ally also omits details between these two interviews. During the first interview, Ally mentioned that he found M.K. with his head resting on the footboard and picked him up before laying him back down to call 911. In the second interview, Ally states that he found M.K. on the floor and immediately called for help. Ally also had contradictory explanations as to how some of M.K.'s injuries, such as the fingermarks on his arms and legs, could have occurred.

16. Further, each tape contained 30-45 minutes of the defendant sitting by himself in the interview room.

[¶54.] This approach allowed the jury to hear and evaluate Ally's recollection of what happened that day uninterrupted. Defense counsel also effectively cross-examined Detective Carda, eliciting testimony that Ally's answers to his questions were consistent throughout all three interviews, including Ally's denial that he hurt M.K. and his consistent recollection of the day's events.[17] The defense also questioned Detective Carda about his interrogation techniques, including being loud, confrontational, and intimidating, and showing Ally pictures taken during M.K.'s autopsy. Moreover, the jury watched over an hour of Ally's second interview with Detective Carda, giving them ample opportunity to consider Ally's demeanor, attitude, and sincerity, or lack thereof, during the interview.

[¶55.] Because defense counsel's decision to limit the jury's exposure to the taped interview footage can be considered sound trial strategy under prevailing professional norms, we conclude that counsel's performance was not deficient, and we need not consider *Strickland's* prejudice prong.

### c. Whether defense counsel's handling of Dr. Ophoven constituted ineffective assistance of counsel.

[¶56.] The habeas court also determined that defense counsel's handling of Dr. Ophoven's testimony constituted ineffective assistance of counsel. The court found Dr. Ophoven's testimony to be instrumental to Ally's case. It determined that

---

17. Given the inconsistencies outlined above, eliciting this testimony from Detective Carda was arguably more effective than playing the videos. Through Detective Carda's testimony, the jury heard that Ally's story remained consistent through all three interviews. Had the jury watched all of the interview footage, they would have been free to focus on any and all inconsistencies between the three interviews, assigning the inconsistencies whatever weight they deemed appropriate. Detective Carda's trial testimony did not give them that opportunity.

defense counsel's decision not to ask clarifying questions on redirect or call Dr. Ophoven on sur-rebuttal was "an unacceptable error," stating that there was "no strategic justification for allowing the State to have the last word." The court also concluded that a "[c]ompetent defense requires, in these circumstances, [that] Dr. Ophoven be recalled for equal time before the jury."

[¶57.] Calling an expert witness to testify for "equal time" as that of an opposing witness has never been this Court's standard for measuring the efficacy of counsel. The standard is whether counsel acted in an objectively reasonable manner "under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065; *McDonough*, 2015 S.D. 1, ¶ 22, 859 N.W.2d at 37. For over twenty years, this Court has recognized that decisions on whether to call a witness are matters of trial strategy and legal judgment that are not subject to second-guessing. *Knecht v. Weber*, 2002 S.D. 21, ¶ 21, 640 N.W.2d 491, 500 (citing *Davi v. Class*, 2000 S.D. 30, ¶ 31, 609 N.W.2d 107, 114–15); *see also Johnson v. Lockhart*, 921 F.2d 796, 799 (8th Cir. 1990). More recently, the Supreme Court has stated that strategic decisions, including whether to hire an expert, are given a strong presumption of reasonableness, reflecting the reality that such decisions also carry the risk of harming the defense by undermining credibility or distracting the jury. *Dunn*, 141 S. Ct. at 2410.

[¶58.] It follows that defense counsel's trial strategy for how to best utilize an expert is entitled to the same presumption of reasonableness. In *Jameson v. State*, the Missouri Court of Appeals had to determine whether defense counsel's treatment of a medical expert fell below prevailing professional norms. 125 S.W.3d

885, 890 (Mo. Ct. App. 2004). The defendant sought post-conviction relief based on ineffective assistance of counsel after being convicted of killing a seventeen-month-old child by inflicting blunt force trauma to the child's abdomen. *Id.* at 887–89. The defense's theory at trial was that the injury resulted from an accidental fall after tripping over a dog cable. *Id.* at 887. Post-conviction, the defendant argued that his attorney was ineffective based on how he handled their medical expert's testimony. *Id.* at 890. The defendant asserted that his "trial counsel incompetently elicited a misleading opinion" and failed to ask the expert "questions regarding the age of [ ] numerous bruises" on the victim. *Id.* However, after reviewing the record, the court rejected the defendant's claim, noting how defense counsel prepared the expert to testify at trial and elicited favorable testimony that contradicted the State's expert. *Id.* The court held that "[i]n this case, there is no basis to conclude that counsel's performance" was deficient; the defendant "failed to overcome the presumption that counsel's [handling of the expert] constituted trial strategy developed in the exercise of professional judgment." *Id.*

[¶59.] Here, the record is equally devoid of any basis for concluding that Smith's treatment of Dr. Ophoven fell below prevailing professional norms. In reviewing defense counsel's performance at trial, we note that, during Dr. Ophoven's direct testimony at trial, counsel elicited evidence favorable to Ally's case, including evidence that contradicted the State's expert. For example, Dr. Ophoven testified that M.K.'s skull showed only one impact of significance. And she contradicted Dr. Snell's opinion that the subgaleal hemorrhaging was evidence of multiple impact sites, explaining that the multiple hemorrhages resulted from blood

diffusing under the scalp caused by a clotting issue (DIC) and the life-saving measures performed by medical personnel. She was highly critical of Dr. Snell's failure to consider M.K.'s DIC diagnosis, something she deemed very important when looking, post-mortem, at the distribution of blood. She further noted that the photos of M.K. taken while he was at the hospital did not show any bruising to his left eye and that Dr. Snell had not analyzed the tissue under this eye, which, in her opinion, should have been done prior to drawing any conclusions that this was a separate injury. Ultimately, Dr. Ophoven testified that in her opinion, based on her many years of experience and her review of the medical evidence, an accident could not be ruled out as the cause of death. Furthermore, she pointed out that the abrasions to M.K.'s ear and cheek and a mark on his lip were not related to his cause of death and were not proof that M.K. was the victim of abuse or violence.

[¶60.] At the habeas hearing, Dr. Ophoven presented evidence cumulative to her trial testimony. When asked what additional testimony she could have provided, Dr. Ophoven, for the most part, reiterated her trial testimony, stating that there was no scientific way to distinguish an accident from an inflicted injury in this case; therefore, the cause of death must be undetermined.

[¶61.] Additionally, Smith's habeas testimony provides further insight into her strategic decisions surrounding Dr. Ophoven's testimony. First, Smith did not call Dr. Ophoven on sur-rebuttal because Dr. Ophoven was scheduled to testify at another trial and was only available to testify at Ally's trial on February 25.[18]

_____

18. In her habeas testimony, Dr. Ophoven could not recall whether she was asked to stay for surrebuttal but stated, "I have provided surrebuttal in the

(continued . . .)

Second, Smith testified that she did not feel it necessary to elicit further testimony from Dr. Ophoven. She believed Dr. Van Ee was the more important witness because his testimony established whether a short fall from a bed could have caused M.K.'s injuries. In Smith's view, the case came down to "whether or not the jury was willing to accept that an accident was possible, or that these injuries could have possibly come from an accident." Third, Smith testified that she did not want to risk irritating the jurors by going back and forth with the same experts on the same issues, especially since she had elicited the testimony necessary to support their theory of the case.[19]

[¶62.] Given that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy," *Harrington*, 562 U.S. at 111, 131 S. Ct. at 791, our review of the record leads us to conclude that defense counsel made reasonable strategic choices that we will not second-guess with the benefit of hindsight. We therefore determine that defense counsel's performance was objectively reasonable under prevailing professional norms.

[¶63.] The habeas court's decision exemplifies "the distorting effect of hindsight" when reconstructing and replaying counsel's challenged conduct. *Reay*, 2019 S.D. 63, ¶ 14, 936 N.W.2d at 121 (citation omitted). During Dr. Ophoven's

---

(. . . continued)
past, and I would never say no to someone who says you must. Um, but I don't remember[.]"

19. Smith described how jurors can get "tired of hearing both sides say the same thing over and over," and by the end of the experts' testimony, "it got to the point where both sides, all we were doing is arguing medical journals. And that is not effective either."

habeas testimony, the court faulted Smith for not asking specific questions to clarify the number of impacts M.K. received or asking questions about certain testimony given by the State's expert, Dr. Snell. The habeas court also directed defense counsel to inquire of Dr. Ophoven on certain topics of interest to the court, including whether the existence of DIC was in Dr. Snell's original report. But it is not the court's role to retry the case in the manner it thinks best. Rather, the court's role is to determine if defense counsel was deficient and whether such deficient performance deprived Ally of a fair trial. And after reviewing the record, we determine that counsel's performance was not deficient, and thus we need not address *Strickland's* prejudice prong.

### d.     *Whether failing to disclose a video relied on by an expert constitutes ineffective assistance of counsel.*

[¶64.]          As discussed above, Ally's defense counsel engaged the services of Dr. Van Ee to testify whether a fall from a bed could create the force necessary to cause M.K.'s fatal head injuries. To conduct his analysis, Dr. Van Ee required information about M.K.'s alleged fall, including M.K.'s position on the floor where Ally claimed to have found him. To assist Dr. Van Ee, Ally's counsel took a cell phone video of Ally explaining this information using a Raggedy Ann doll to demonstrate M.K.'s position on the floor and sent it to Dr. Van Ee. But defense counsel failed to provide a copy of this video to the State.

[¶65.]       At trial, the State discovered the existence of the undisclosed video while cross-examining Dr. Van Ee.[20] At which point, the court held a bench conference. After the bench conference, there was no further reference to the video in front of the jury until the State's closing arguments. In a hearing outside the jury's presence, where the State sought to make a record of what occurred at the bench conference, the State requested that the circuit court strike Dr. Van Ee's testimony as a sanction for defense counsel "violating rules concerning experts." In response, Smith argued that disclosure was not required because it fell under the attorney work-product doctrine. The court agreed with the State, stating, "I think it is something that in the ordinary course of an expert's testimony is going to turn upon it; it should be disclosed." However, the court rejected the State's suggestion to strike Dr. Van Ee's testimony, explaining that the remedy of striking the testimony would be "much too severe," where there was no showing of prejudice. During its closing argument, the State alluded to the fact that defense counsel had failed to disclose something to them in preparation for trial, stating:

> It's very important that you receive all of the evidence, ladies and gentlemen, both good and bad, [it's] why the state has presented evidence to you, including the Defendant denying his guilt, including testimony as to injuries which were not related to this event because you must have all of that information.

20.    The State became aware of the undisclosed video through Dr. Van Ee's testimony that Ally found M.K. with his "head propped on the footboard." The State claimed this was information which they didn't previously have, but the record suggests otherwise. In Ally's first interview with Detective Carda, he describes finding M.K. on the floor next to the bed with his head on the side of the wood bed frame. (12/24/12 interview).

In its rebuttal to the defense's closing, the State's reference to the discovery error was more specific:

> [It's] important to just [ ] know that Dr. Van Ee based his hypothesis on a new fact and a new fact that apparently came out at a later date in some conversation or interview with the Defendant that wasn't presented to us to consider. That's why it's important, not because I think the facts are important but because Dr. Van Ee apparently considered the fact important enough to present it to you as part of his hypothesis. In his hypothesis concerning the bruise, the posterior bruise, which as I explained is very important because it reflects another point of impact inconsistent with their hypothesis.

At the habeas evidentiary hearings, Smith acknowledged that the video should have been disclosed to the State. And in its findings of fact and conclusions of law, the habeas court ultimately determined the "presence of this discovery error undermine[d] [its] confidence in the original result."

[¶66.] The failure to comply with discovery rules or orders can result in deficient performance, especially when the court sanctions the violation by excluding evidence or striking witness testimony. As the habeas court correctly concluded, the facts and data underlying an expert's opinion should have been disclosed prior to his cross-examination at trial.[21] *See* SDCL 23A-13-12; SDCL 23A-13-13; SDCL 19-19-705. Consequently, defense counsel's failure to disclose the video to the State fell below the objective standard of reasonableness that competency requires.

---

21. After receipt of Ally's motion for discovery, the State filed a reciprocal motion for discovery. At a pretrial motion hearing the State requested expert reports in advance of trial. Ally's counsel did not object to the request and agreed to provide in advance the experts reports and "what they were basing their testimony on . . . ." The circuit court, however, did not set a pretrial deadline for disclosure.

[¶67.] Despite this, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S. Ct. 2066. To determine whether the error affected the judgment below, this Court asks whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

[¶68.] Here, we conclude that the error was not sufficient to undermine the outcome of the proceeding. First, counsel's error did not result in Dr. Van Ee's testimony being excluded. Second, aside from the State's brief reference to the nondisclosure in its closing argument, the discovery violation was addressed entirely outside the jury's presence. Third, during their closing argument, the defense explained to the jury that they sent a video recording of Ally's explanation of what occurred to Dr. Van Ee because it was not feasible to fly Dr. Van Ee to Sioux Falls to discuss the matter with Ally before trial.[22] Fourth, Ally testified after Dr. Van Ee, telling the jury the same information—that he found M.K. lying on the floor with the back of his head "tilted a little bit up" against the footboard of the bed.

---

22. In her closing argument, Smith explained the issue to the jury, stating, "[t]he State tries to suggest that Van Ee relied on something that was hidden from the jury, that they had a statement from my client that the State didn't have or that we tried to keep from the jury. My client testified, just as the State notified their witnesses and met with their witnesses outside of the courtroom. Dr. Van Ee lives in Michigan. Our client lives in Sioux Falls, South Dakota. There's no way to set up a meeting when we live in separate states, so we have to make arrangements so that we can tell him what our client is saying so that he can understand what it is that we're saying our client is saying. Our client testified. Mr. Hanson doesn't say that Dr. Van Ee's testimony was inconsistent with what our client testified to. The State didn't say that our client testified to anything differently than what he told Dr. Van Ee. So don't bite that hook. We're not hiding anything."

Considering the State's limited reference to the undisclosed video in closing argument, and Smith's explanation in response, Ally cannot show prejudice. There is no reasonable probability that but for the State's reference in closing arguments the jury's verdict would have been different. We, therefore, conclude that Ally was not prejudiced by counsel's failure to disclose the video.

### e. Whether there was cumulative error amounting to ineffective assistance of counsel.

[¶69.] The habeas court determined that the "cumulative effect" of counsel's errors undermined the reliability of the jury's verdict. On appeal, Ally makes the same argument. In *Reay*, this Court addressed the issue of "cumulative error," recognizing that combining multiple alleged errors, none of which constitute an error of constitutional magnitude alone, to find prejudice would be to "recognize a degree of error that is greater than the sum of its parts." *Reay*, 2019 S.D. 63, ¶ 26 n.7, 936 N.W.2d at 124 n.7. Because this Court did not find more than one alleged error to be of constitutional magnitude, this Court would have to recognize a degree of error larger than the sum of its parts to find prejudice based on the cumulation of errors. This we decline to do.

## Conclusion

[¶70.] Ally was not deprived of his Sixth Amendment right to counsel. While defense counsel's opening statement included an imprecise remark, not attributable to trial strategy, the mistake did not undermine the adversarial process or deprive Ally of a fair trial. Further, Ally's defense counsel made a reasonably strategic decision to exclude parts of Ally's three interviews with Detective Carda. Counsel effectively elicited the same exculpatory evidence, and inferences contained therein,

from the hour-long segment of interview footage played for the jury and from Detective Carda's and Ally's testimony at trial. In addition, counsel's decision not to elicit additional testimony from Dr. Ophoven was a strategically reasonable decision. Further, Ally has not shown how failing to ask certain questions that were developed with the benefit of hindsight overcomes the presumption that counsel exercised reasonably professional judgment during trial. Lastly, counsel's failure to disclose the video shared with Dr. Van Ee prior to cross-examination was a deviation from prevailing professional norms, but it did not result in significant prejudice to Ally. The court did not exclude any favorable evidence as a consequence, the matter was handled outside the presence of the jury, and defense counsel was able to address the State's limited reference to the matter during Ally's closing argument. Accordingly, we conclude that Ally did not receive ineffective assistance of counsel at his 2012 trial, and the habeas court's decision is hereby reversed.

[¶71.] JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, and SMITH, Circuit Court Judge, concur.

[¶72.] SMITH, Circuit Court Judge, sitting for SALTER, Justice, who deemed himself disqualified and did not participate.